SAMUEL MARKELL, executor, vs. SIDNEY B. PFEIFER
FOUNDATION, INC.

Suffolk. May 19, 1978. — March 24, 1980.

Present: GRANT, ARMSTRONG, & BROWN, JJ.

*Practice, Civil,* Findings by judge, Appeal. *Mistake. Trust,* Rescission,
Reformation, Mistake. *Attorney at Law. Fiduciary. Undue In-
fluence. Probate Court,* Counsel fees.

That a judge's findings of fact were taken principally from those prepared
by the plaintiff's counsel did not render the "clearly erroneous" stand-
ard of Mass.R.Civ.P. 52(a) inapplicable to review of the findings;
however, an appellate court is likely to accord the findings entered by
a trial judge greater weight if he prepared them himself or if he has so
reworked a submission by counsel that it is clear that the findings are
the product of his independent judgment. [414-418]
This Court employed the "clearly erroneous" standard of Mass.R.Civ.P.
52(a) in reviewing findings of fact principally prepared by the plain-
tiff's counsel in a civil action even though the evidence most directly
relevant to the areas of dispute was preponderantly documentary
where the case concerned issues of veracity arising on conflicting writ-
ten testimony, where the judge's findings involved some consideration
of oral testimony adduced in court, and where the judge did not en-
tirely adopt the findings as prepared. [429-432]
In an action by the settlor of a trust seeking a determination that she had
the power to revoke a scheme for the distribution of certain of her
property set out in a trust declaration, there was sufficient evidence to
warrant a finding that she had signed the trust documents without
understanding that the legal effect of those instruments was to alienate
her power to control and dispose of the trust assets as she might wish.
[432-438]
That the settlor of an irrevocable trust signed the trust documents without
understanding that the legal effect of those instruments was to alienate
her power to control and dispose of the trust assets did not constitute a
mistake which would customarily warrant rescission of the trust; how-
ever, where the settlor was induced to sign the documents by her
nephew who benefited substantially by the trust and upon whose judg-
ment and integrity she relied in committing to him the management of

her financial affairs and where the nephew breached his fiduciary du-
ty to the settlor by failing to make her aware of the legal significance of
the trust documents, the trusts were properly declared void. [438-445]
In an action by the settlor of a trust seeking a determination that she had
the power to revoke the trust, the judge did not abuse her discretion in
refusing to award counsel fees to a foundation which, as beneficiary of
the trust, had undertaken the defense of the trust where the execution
of the trust resulted from the breach of a fiduciary duty which was
properly attributed to the foundation. [446-448]

CIVIL ACTION commenced in the Probate Court for the
county of Suffolk on December 19, 1967.

The case was heard by *Fitzpatrick, J.*

*Jack R. Pirozzolo* (*Richard L. Binder* with him) for
Sidney B. Pfeifer Foundation, Inc.

*George A. McLaughlin, Jr.* (*John S. Leonard* with him)
for the plaintiff.

*Norman S. Weinberg & Dwight L. Allison* for Kate Lewis
& Freda Assner, submitted a brief.

ARMSTRONG, J.   This action was commenced by Minnie
G. Hey on December 19, 1967, three days before her death,
and was continued by the present plaintiff, who is the exe-
cutor named in her will and the principal beneficiary there-
under.  The purpose of the action was to obtain a judicial
determination that she had the power to revoke a scheme
for the distribution of certain of her property (substantially
all, apparently, of her intangible personal property, amount-
ing to approximately $700,000 in value at the time of her
death) set out in a trust declaration which she had executed
on October 24, 1966.  The trust instrument, as then exe-
cuted, provided that the income should go to her for life and
then to her nephew, Sidney B. Pfeifer, for life (he died,
however, on June 4, 1967, six months before Minnie Hey),
and, at the death of the survivor, the trust assets should go
to the defendant foundation outright.  Her complaint sought
either of two forms of relief, in the alternative.  The first
was a determination that her assent to the declaration of
trust (as well as to a predecessor declaration of trust in
Pfeifer's favor executed on February 25, 1960) had been ob-

tained as a result of fraud, mistake, or undue influence and that the trust was therefore void; the second was a determination that the trust reserved to her a power to amend the scheme of distribution under the trust and that she had validly exercised that power by instruments executed on August 29, 1967, and November 14, 1967. The schemes of distribution set out in those instruments were mirrored in wills executed the same days as the trust amendment instruments, so as to have the trust assets distributed identically, principally to Minnie Hey's friends and their families,[1] whether they should pass under the will or under the trust as amended. The sole beneficiary under the 1966 trust as unamended would be the defendant foundation.

The trial judge entered findings and rulings to the effect that Minnie Hey was induced by Sidney Pfeifer to execute the trust without full comprehension of its nature and legal effect, that the trust was therefore void, and that, in any event, the amendments of August 29 and November 14, 1967, were executed in accordance with the terms of the trust and were therefore valid.

The case is here on the foundation's appeal from the ensuing judgment declaring the trust to be void and the assets thereof to be a part of Minnie Hey's estate and denying the foundation's motion for the payment of its counsel fees from the estate.

## The Effect of the Judge's Findings

Before reaching the question of the propriety of the judge's disposition of the case on the merits, we encounter a preliminary procedural contention by the defendant foundation concerning the weight to be given the findings of fact entered by the judge. The contention is that the judge failed

---

[1] Twenty or more friends and children and spouses of friends stand to share a total of $228,500; four charities (the defendant is not included), $22,000; and the plaintiff in his individual capacity, the residue, estimated to be approximately half a million dollars at the time of Minnie Hey's death and three-quarters of a million dollars when the case was argued.

to discharge the duty of making findings based on the evidence as she viewed it and instead mechanically adopted findings of fact prepared by counsel for the plaintiff. Such findings, the defendant argues, are entitled to be given no weight on appeal; rather, as the case is before us on full report of the evidence, we should examine the evidence and make our own findings and draw our own conclusions therefrom, independent of those adopted by the judge.

The point is one which, so far as we have discovered, has been alluded to only briefly in our cases,[2] but it has been extensively discussed in numerous Federal cases; and, because our present rules of civil procedure (which applied to the findings in this case[3]) are patterned on Federal practice, those Federal cases are helpful, if not binding, precedent in determining the legal soundness of the defendant's contention. *Rollins Environmental Servs., Inc.* v. *Superior Court*, 368 Mass. 174, 179-180 (1975). *Westinghouse Elec. Supply Co.* v. *Healy Corp.*, 5 Mass. App. Ct. 43, 47 (1977), and cases cited.

Rule 52(a), 365 Mass. 816 (1974), like its Federal counterpart, provides that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially . . . . Findings of fact shall not be set aside unless clearly errone-

---

[2] The only mentions we find are in *Number Three Lounge, Inc.* v. *Alcoholic Beverages Control Commn.*, 7 Mass. App. Ct. 301, 308 n.19 (1979), and in *Cormier* v. *Carty*, 8 Mass. App. Ct. 401, 401 n.1 (1979). The latter decision upheld findings prepared by counsel for the successful defendant, in part because the plaintiff had received notice and had the opportunity to file competing findings for the judge's consideration. The present record is silent as to the circumstances in which the plaintiff was asked to prepare findings.

[3] The Massachusetts Rules of Civil Procedure, 365 Mass. 730, took effect on July 1, 1974, and, under rule 1, govern "procedure . . . in the Probate Court in proceedings seeking equitable relief . . . ." The present case was tried before that effective date (there were twenty-three days of trial, beginning February 4, 1974, and ending April 23, 1974); but the judge's findings were not entered until October 20, 1976, and, pursuant to Mass.R. Civ.P. 1A(8), 365 Mass. 732 (1974), "[i]n all jury-waived or equity cases tried before July 1 [1974] but in which findings have not been filed by that date, all further proceedings shall conform to the new Rules."

ous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." "The purpose of that rule is to require the trial judge to formulate and articulate his findings of fact and conclusions of law in the course of his consideration and determination of the case and as a part of his decision making process, so that he himself may be satisfied that he has dealt fully and properly with all the issues in the case before he decides it and so that the parties involved and this court on appeal may be fully informed as to the bases of his decision when it is made. Findings and conclusions prepared ex post facto by counsel, even though signed by the judge, do not serve adequately the function contemplated by the rule." *Roberts* v. *Ross,* 344 F.2d 747, 751-752 (3d Cir. 1965).

It has been said that "[a]s an ideal matter, it would be desirable for the trial judge to draft his own findings in every case. This would supply insurance, for the benefit of the appellate court, that the trial judge did indeed consider all the factual questions thoroughly and would guarantee that each word in the finding is impartially chosen." *Louis Drefus & Cie.* v. *Panama Canal Co.,* 298 F.2d 733, 738 (5th Cir. 1962). "The independence of the court's thought process may be cast in doubt when the findings proposed by one of the parties wind up as the court's opinion and the courts have not looked with favor upon the practice." *In re Las Colinas, Inc.* 426 F.2d 1005, 1009 (1st Cir. 1970).

The Federal appellate courts have not, however, insisted on the ideal. They have instead taken the practical view that "[i]n the workaday world . . . it may often be necessary for a hard-pressed district court to take assistance from counsel in articulating his decision"; and "[n]umerous cases have approved the practice of adoption by the trial judge of findings submitted by counsel for the prevailing party and have held that such findings are entitled to the same weight as they would receive if drafted by the judge himself." *Louis Dreyfus & Cie.* v. *Panama Canal Co., supra* at 737 and 738 (where cases from five circuits are cited approving the latter proposition). The Supreme Court has held that "findings,

though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." *United States* v. *El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964). To the same effect, see *United States* v. *Crescent Amusement Co.*, 323 U.S. 173, 184-185 (1944); *O'Leary* v. *Liggett Drug Co.*, 150 F.2d 656, 667 (6th Cir.), cert denied, 326 U.S. 773 (1945); *Volkswagen of America, Inc.* v. *Jahre*, 472 F.2d 557, 559 (5th Cir. 1973); *George W. Bennett Bryson & Co.* v. *Norton Lilly & Co.*, 502 F.2d 1045, 1049 n.17 (5th Cir. 1974); *Keystone Plastics, Inc.* v. *C&P Plastics, Inc.*, 506 F.2d 960, 962-963 (5th Cir. 1975); *Schwerman Trucking Co.* v. *Gartland S.S. Co.*, 496 F.2d 466, 474-475 (7th Cir. 1974); *Bradley* v. *Maryland Cas. Co.*, 382 F.2d 415, 423 (8th Cir. 1967 [Blackmun, J.]); *Nissho-Iwai Co.* v. *Star Bulk Shipping Co.*, 503 F.2d 596, 598 (9th Cir. 1974). A few cases suggest that the practice of adopting verbatim findings prepared by counsel is best restricted to cases turning on scientific or technical facts, as do many patent and some antitrust cases (see e.g., *Louis Dreyfus & Cie.* v. *Panama Canal Co.*, 298 F.2d at 737; *In re Las Colinas, Inc.*, 426 F.2d at 1009; *Reese* v. *Elkhart Welding and Boiler Works, Inc.*, 447 F.2d 517, 520 [1971]); but the foundation's contention that adopted findings are to be disregarded in other types of cases is belied by scores of decisions, including some of those cited by the foundation, which observe no such rule.

That the judge's findings were taken principally (although, as will be seen, not entirely) from those prepared by plaintiff's counsel does not make the "clearly erroneous" standard of rule 52(a) inapplicable. On the other hand, that standard is not one of exact or mechanical precision: It involves a measure of judgment or discretion by appellate courts in its application,[4] and there are necessarily cases in

---

[4] The usual formulation is that "[a] finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

which the correctness of findings of fact viewed against the whole record presents a close question for decision. In such cases, an appellate court is likely to accord the findings entered by the trial judge greater weight if he prepared them himself or if he has so reworked a submission by counsel that it is clear that the findings are the product of his independent judgment. *In re Las Colinas, Inc.*, 426 F.2d at 1010. *Tanker Hygrade No. 24* v. *The Dynamic*, 213 F.2d 453, 456 (2d Cir. 1954). *Roberts* v. *Ross*, 344 F.2d at 752. *The Severance*, 152 F.2d 916, 918 (4th Cir.), cert denied, sub nom. *Stone* v. *Diamond S.S. Transp. Co.*, 328 U.S. 853 (1945). *Louis Dreyfus & Cie.* v. *Panama Canal Co.*, 298 F.2d at 736-738. 9 Wright & Miller, Federal Practice and Procedure § 2578, at 707 (1971).

In the *Louis Dreyfus & Cie.* case, quoted from earlier, Judge Wisdom draws a further distinction which, as will be seen below, is of particular applicability to the decision of the trial judge in the present case. "If the decision depends directly on two or three issues that are clearly drawn, it will be clear that the judge must have focussed on those questions before reaching his decision, and therefore it can readily be assumed that the findings accurately reflect his convictions. By contrast, if the questions of fact are complicated and numerous, not all of them being crucial to the determination of the case as a whole, there is greater cause for suspicion that the judge may have allowed certain of the proposed findings to slide under the fence, despite his doubts as to the questions, because they were not necessary to the decision." 298 F.2d at 738. The significance of this distinction will become apparent as we turn to an analysis of the areas of factual agreement and factual dispute in the case presently before us.

## THE FACTUAL BACKGROUND

Minnie Hey was born in Poland in 1874 and emigrated to the United States as a young girl. In 1895 she married her first husband, who was killed in an accident. In 1907 she married one Ellis Hey, who was successful in the textile busi-

ness.  He died in 1914, leaving his wealth to her.  She had no business training or experience, but she entrusted her business affairs to qualified professionals in whose hands her inheritance prospered.  Her income-producing investments were apparently her exclusive source of support for most of her life and constitute the bulk of the assets which are presently in dispute.

Minnie Hey had no children by either of her marriages. After the death of her second husband, her closest relative in this country was her sister, Augusta Pfeifer, who came to the United States some time before September 3, 1893, when she gave birth to Sidney Pfeifer in Rochester, New York.  There were other relatives who remained in Europe but who were not heard from, apparently, after the Second World War.  Augusta Pfeifer came to Boston and lived with Minnie Hey until Augusta died in 1942.  Sidney Pfeifer married and had two daughters, Dorothea Pfeifer Freeman and Phyllis Pfeifer Cutler, from both of whom he became, for reasons not disclosed by the record, irreconcilably estranged. Dorothea died in 1956, leaving two children.  By the late 1950's, therefore, Minnie Hey's only known blood relatives were Sidney Pfeifer, who lived in Buffalo, his daughter Phyllis Cutler of Philadelphia, and the two Freeman children, who lived in the Boston area but were not in touch with Minnie Hey.

Sidney Pfeifer, by contrast, became close to Minnie Hey during the 1950's and remained so until his death in 1967. During that time Minnie Hey lived in a fashionable Back Bay apartment with her housekeeper, Gertrude Remmes, from whom we learn much of what we know of Minnie Hey's style of living in that last decade and a half of her life. She liked to go out by day, shopping or for lunch, usually with a friend, Kate Lewis.  (The testimony gives the impression that the friendship with Kate Lewis was not without friction but was nevertheless strong and persistent.)  She was a frequent and enthusiastic theater-goer, usually with Kate Lewis or, on the occasions when he was in Boston, perhaps once a year, with Sidney Pfeifer.  On Sundays she went

with Kate Lewis to dinner at the home of her (Kate Lewis's) daughter. She had other visitors, a frequent one being Marcia Markell, wife of the plaintiff in this action. She liked travel. She often vacationed in Florida in the late winter, sometimes with Kate Lewis or Sidney Pfeifer. She occasionally took trips to Buffalo, sometimes with Gertrude Remmes, to visit Sidney Pfeifer; on such occasions she and Gertrude Remmes stayed in hotels. Minnie Hey and Sidney Pfeifer would frequent theatrical productions, both having a highly developed interest in theater. There seems little doubt, particularly from the seemingly disinterested testimony (by deposition) of Minnie Hey's regular physician from 1954 onwards, that she had developed by the late 1950's a strong affection for and complete faith in Sidney Pfeifer, a mother-and-son type of relationship, that was not impaired (as the judge found, this point being disputed) until Sidney Pfeifer's unexpected death on June 4, 1967.

To understand the findings and conclusions which are in dispute, it is necessary to trace chronologically, and in some detail, the course of Minnie Hey's estate planning and the manner in which it came to be intertwined with the affairs of Sidney Pfeifer. In 1945 Minnie Hey decided that she should have a will drafted. She obtained from Max Gidez, an accountant and friend who prepared her tax returns from the early 1930's onwards and who periodically had breakfast with her on Sunday mornings to review her stock holdings, the name of Mr. Samuel Markell, a Boston attorney in general practice. Minnie Hey, according to Mr. Markell, told him that she selected him because she had heard about his activities in various philanthropies. Over the course of four meetings during which she was crystalizing her thinking about the objects of her bounty, she proposed to him that he be the residuary legatee. This he refused, according to his testimony; but at her insistence he included in the will bequests of $25,000 for himself and $25,000 for each of his two sons. The 1945 will also included bequests of $10,000 to Sidney Pfeifer; $25,000 to relatives by marriage; $25,000 for Max Gidez, the accountant; $5,000 for Mrs. Gidez;

$2,500 for Kate Lewis; and the residue, then about $200,000 was bequeathed to fourteen charities. Mr. Markell was named executor.

In early 1946 Minnie Hey had a new will drawn by the late Mr. Walter Powers. She explained to him that she wished to increase certain of the bequests included in the 1945 will for individuals; that Mr. Markell had advised her that since he and members of his family were to be beneficiaries she should have independent legal advice; that he (Markell) had directed her to Mr. Neil Leonard, who had in turn had her select one of six lawyers suggested by him, in order, he explained, that the will not be drawn by an attorney selected by Mr. Markell. Recognizing that the circumstances suggested the possibility of undue influence, Mr. Powers and an associate, the late Mr. Bertram Loewenberg, who was to witness the will, left contemporaneous memoranda in their files detailing their own inquiries and conclusions in that regard. Mr. Powers, who talked with Minnie Hey not only about the will but also about a wide variety of subjects during three meetings in his office and two telephone conversations, depicted her as being "unusually keen, sensible, and clear-thinking, not only for a woman of her age (which I think she said was 72) but for a woman of any age. Everything in her conversation, her quick grasp of any point that came up, and her well-poised manner convinced me that she was in full possession of entirely sound mental faculties." The 1946 will increased the bequest to Sidney Pfeifer to $25,000; increased the aggregate of bequests to relatives by marriage to $40,000; increased the bequest to Kate Lewis to $10,000; increased the bequest to Mr. Markell's eldest son Myron to $125,000; and added a new bequest of $25,000 to Marcia Markell. The Gidez bequests stayed the same; the residue for charities is estimated to have been about $100,000 at that time. She gave Mr. Powers plausible answers to his questions concerning the relatively small bequests to relatives,[5] the conspicuously large

---

[5] "I asked her why she was giving comparatively small amounts to her niece and nephews. She said that they were the children of her sister; that

bequest to Myron Markell and the possibility of influence on her by Mr. Markell or Max Gidez.[6]  Mr. Powers concluded his memorandum: "I feel certain, without any reservation, that she had full testamentary capacity, and that the will represents in every respect her own calm judgment, free from any outside influence."  The 1946 will remained in effect for thirteen years, amended by a 1951 codicil, drafted by Mr. Loewenberg, directing that various specified household furnishings go to Marcia Markell rather than to one Elizabeth MacKnight, one of the relatives by marriage, who was otherwise to receive all household furnishings.

In 1959 Minnie Hey contacted Mr. Reuben Landau, a Boston attorney, and had him draw a new will.  The notes Mr. Landau took at the time were cryptic; fifteen years later he testified that Minnie Hey, "in [her] middle 80's as I remember it — [was] the most remarkable lady I ever met in my life.  She was regal.  She was well groomed.  She was entertaining.  She knew what she wanted.  She was absolutely delightful to talk with."  On August 13, 1959, Minnie Hey executed a simple will, drawn by Mr. Landau, which would have left $50,000 to Myron Markell, $20,000 to Marcia Markell, $10,000 to Kate Lewis, $2,500 to Gertrude Remmes, $5,000 each to Max Gidez and his wife (or $10,000

---

her money had been earned by her husband, to whom the niece and nephews were not related; that two of the nephews she seldom saw or had never seen (I am not certain which); that she was fond of the nephew Sidney [Pfeifer] but that she did not like his wife, and for that reason was unwilling to give any considerable sum to Sidney and that the sums stated in this will (increased in some instances from the prior will) were what she wished to give to them."

[6] "She said that they had not exerted any influence of any kind, not even to the extent of asking her to remember them or any of them in her will . . . that her reason for the bequests to Mr. & Mrs. Gidez and to the four Markells was in each instance because they were friends of hers, members of the same race, and upright, well-behaved persons whose conduct and character merit some such recognition and encouragement [; and] that the increase in the legacy to Myron Markell was prompted wholly by her sympathy for his affliction [he had suffered permanent injuries in the armed services in World War II] and her wish to assure him that he would be in no danger of becoming a dependent cripple."

to the survivor), and a total of $25,000 to two charities, one of which was suggested by Mr. Landau. The residue was to go to Sidney Pfeifer[7] if he survived her; otherwise, the residue was to go to the Massachusetts General Hospital. Mr. Landau was to be executor. Four days later, August 17, 1959, Minnie Hey revoked the August 13, 1959, will and executed another like it except that it contained an additional pecuniary bequest, $5,000 each to Thomas and Elizabeth MacKnight, or $10,000 to the survivor. On December 3, 1959, Minnie Hey executed a codicil increasing Gertrude Remmes' bequest to $5,000.

Before we relate the next step in Minnie Hey's estate planning, the creation of the contested 1960 trust, it is worth pausing to reflect on the change in her feelings which transpired over the decade of the 1950's. When making the 1946 will, Minnie Hey had told Mr. Powers that she was leaving a relatively small bequest to Sidney Pfeifer because she did not like his wife. In 1951 the Pfeifers were divorced, and Minnie Hey apparently gave Sidney Pfeifer the $25,000 which he used as a property settlement. After that time Sidney Pfeifer began drawing closer to Mrs. Hey, a fact attested to by Wolfred Freeman, the husband of Pfeifer's estranged daughter who died in 1956, who testified that his family had experienced a sudden chilling of Minnie Hey's attitude toward them as a result of her closer relationship with Sidney Pfeifer. Gertrude Remmes, the housekeeper after 1951, testified that in the early 1950's Sidney Pfeifer was an infrequent — perhaps once a year — visitor, but that his visits had become more frequent by the late 1950's. In the late 1950's and early 1960's Minnie Hey made several trips to visit or vacation with Sidney Pfeifer. Most significantly, over the course of the 1950's Minnie Hey repeatedly made substantial gifts of stock to Sidney Pfeifer, the value of which totalled approximately $320,000 in the summer of

---

[7] Mr Landau testified that Minnie Hey had told him that Sidney Pfeifer, her "only . . . living relative . . ., was a lovely man. She said she had great affection for him."

1967 (approximately $492,000 including dividends and stock splits) — a figure representing something in the order of a third of her total stock holdings in the period when the stocks were given.

In the winter of 1959-1960, apparently at the suggestion of Pfeifer, Minnie Hey decided to forgo her usual winter trip to Florida (generally, but not invariably, with Kate Lewis) and instead vacationed in Palm Springs, California, with Pfeifer. Gertrude Remmes, who as servant accompanied Mrs. Hey, testified that Minnie Hey gave Pfeifer $14,000 to pay for their combined expenses. In the first week of the vacation Minnie Hey slipped coming out of a shower and fell, fracturing several ribs. She was hospitalized for two and a half weeks, until the end of January, 1960, completing her recuperation at a lodge in Palm Springs (not the motel where she had fallen), attended by Gertrude Remmes and visited twice a day by a physician named Sage.

In early February, Sidney Pfeifer flew back to Buffalo and returned to Palm Springs with a trust document said to have been drafted by (the point is contested) a Buffalo attorney named Albert Mugel, a friend of Pfeifer, by the terms of which Minnie Hey would transfer various stock certificates set out in a schedule to herself and Pfeifer as trustees, income to Minnie Hey for life and, at her death, the corpus to Pfeifer free of the trust. No power of revocation was reserved, but a narrow power was reserved to Minnie Hey as grantor to amend the beneficial interests in the trust in favor of blood relatives. (Mr. Mugel, the alleged draftsman, suggested that the purpose of this limited power of amendment was to avoid gift tax consequences, the only persons who could benefit by its exercise being Pfeifer's estranged daughter Phyllis Cutler and the two estranged Freeman grandchildren.) The trustees had a power to invade the corpus for the benefit of the grantor. The trust was executed by Minnie Hey and Pfeifer on February 25, 1960, and notarized. The schedule of stocks transferred into the trust appears to have included most, but not all, of Minnie Hey's remaining stock holdings.

On March 3, 1960, roughly a week after executing the trust, Minnie Hey, still at the Palm Springs lodge, executed a new will, witnessed by Dr. Sage, a special duty nurse, and an unidentified third person, by which she left $5,000 bequests to Elizabeth MacKnight, to the latter's husband, to Myron Markell (the plaintiff's disabled son), to Gertrude Remmes, and to Kate Lewis. The residue was to go to Sidney Pfeifer, who was named executor. Pfeifer had engaged Dr. Sage's attorney to prepare the will (and also to notarize the trust). Pfeifer and Gertrude Remmes remained outside the room during the signing, Pfeifer explaining to Gertrude Remmes that they could not be present because they were going to be "mentioned" in the will. At the end of March Minnie Hey, by this time largely recuperated, returned with Gertrude Remmes to Boston.

On October 23, 1961, September 26, 1962, and January 2, 1963, Minnie Hey and Sidney Pfeifer executed supplemental trust agreements ratifying the February 25, 1960, trust and adding in successive stages substantially all of Minnie Hey's remaining intangible personal property. The result was that, after January 2, 1963, all of her wealth (which according to Landau totalled about half a million dollars in 1959) other than tangible personal property was tied up in the trust, subject to no power of revocation, from which she was entitled to the income (estimated by Mr. Landau to be $25,000 in 1959) and Sidney Pfeifer, at her death, to the corpus. She was then 88 years old.

In the summer of 1966 Sidney B. Pfeifer caused to be incorporated (under New York law) the nonprofit foundation which bears his name and is the appellant herein. Its corporate purpose was to benefit the performing arts, with the goal, if feasible, of establishing a drama center, including a theater and auxilliary facilities, at New York University's Buffalo campus. In August, 1966, he executed a new will by which his residuary estate, after the payment of $11,250 in pecuniary legacies, was to be put in a testamentary trust, income to Minnie Hey for her life, and upon her death the corpus to be divided evenly between one Herbert Holtz, a

friend and the named executor under the will, and the foundation. In November of the same year he (Pfeifer) set up a revocable inter vivos trust, the net income of which was payable to Pfeifer for life and then to Minnie Hey for life if she should survive him; at the death of the survivor the corpus was to be given over to the foundation free of the trust. The trust, like the foundation, remained unfunded for a time.

In the autumn of 1966, when Mr. Mugel was working out the details of the foundation and the appropriate vehicles for channelling Minnie Hey's and Pfeifer's combined assets into it, Pfeifer and Mugel reflected on the proposition that it would be advantageous from the viewpoint of taxation to have Minnie Hey's assets pass directly to the foundation rather than first to Pfeifer and at his death to the foundation. Mr. Mugel accordingly drew up a new trust agreement to replace Minnie Hey's February 25, 1960, trust. (That trust was generically "irrevocable"; but because no person other than Minnie Hey and Sidney Pfeifer had any legal or beneficial interest in the trust it could have been terminated by their joint act.) The new trust agreement provided that the net income should go to Minnie Hey for her life, then to Sidney Pfeifer for his life if he survived her; at the death of the survivor the corpus was to pass free of the trust to the foundation. Minnie Hey reserved, as before, the largely useless discretionary power to divert principal to blood relatives; she was also given the power to revoke or amend the trust, but only with the consent of Pfeifer. On September 2, 1966, at a brunch meeting in a public dining room of a Buffalo hotel, Mr. Albert Mugel explained the proposed new trust and the probable resultant tax savings to Minnie Hey. Sidney Pfeifer was present; Gertrude Remmes waited outside, to assist Minnie Hey, then 92, to and from the table. Minnie Hey asked no questions concerning the trust.

The new trust was subsequently executed by Minnie Hey and Sidney Pfeifer in Boston, apparently at the Copley Square office of the State Street Bank and Trust Company (bank) on October 24, 1966. The trustees were Minnie Hey and Sidney Pfeifer. Should Minnie Hey die or otherwise

become unable to serve as trustee, one James Kelly, a friend and colleague of Sidney Pfeifer in Buffalo, and a trustee of both the unfunded Pfeifer trust and the Pfeifer foundation, was to serve as successor trustee; the bank was named successor trustee in the event of Sidney Pfeifer's death or incapacity.

Those are, in skeleton form, the operative events with which we are concerned on the view we take of the case; by way of finishing the narrative we mention a few additional facts. In May, 1967, Sidney Pfeifer suffered a heart attack in Buffalo and was hospitalized; on May 24 he funded his trust with the bulk of his wealth, namely, the roughly half million dollars in stocks which had been given to him by Minnie Hey in the 1950's. On June 4, 1967, he died, still in the hospital. Minnie Hey was distraught by his death and apparently confused by the state of her financial affairs. She fretted about money and repeatedly asserted that she had never intended to give up ultimate control of her fortune. She consulted Mr. Markell, who advised her to work through Mr. Loewenberg (Mr. Powers having retired). Through Mr. Loewenberg and his colleague, Mr. James Barr Dolan, she executed the wills and corresponding trust amendments discussed earlier,[8] which were to have the effect, if valid, of vitiating the gift to the defendant foundation. On September 26, 1967, she signed an affidavit prepared for her by Mr. Loewenberg, in which she recounted her recollection of the events surrounding the execution of the February 25, 1960, and October 24, 1966, trust agreements and the first (August 29, 1967) of the trust amendments and wills after Pfeifer's death. By the affidavit she swore that she did not understand the 1960 and 1966 documents to be trusts or that she was thereby alienating her power to control and dispose of her property as she should wish. On December 19, 1967, the present proceeding was commenced in Mrs. Hey's name, seeking a determination of the invalidity of the 1960 and 1966 trusts or, alternatively, a declaration of the validi-

---

[8] See text at note 1, supra.

ty of the August and November, 1967, trust amendments.
Three days thereafter, on December 22, 1967, Minnie Hey,
then 93, collapsed while leaving the luncheon table in her
apartment and died before her physician could arrive.

After her death and the substitution of Mr. Markell, her
executor, as plaintiff, the case was tried for both sides[9] with
exceptional thoroughness.[10] The foundation filed an answer
and counterclaim seeking, in part, a determination that the
August and November, 1967, trust amendments were inval-
id on the grounds that they were procured by the undue in-
fluence of Mr. Markell and Kate Lewis, that the power to
consent to trust amendments was personal to Sidney Pfeifer
and did not pass to the bank as successor trustee, and on the
further ground that, if such a power did pass, the bank
breached its fiduciary duty to the foundation, as beneficiary,
by consenting to amendments which wholly supplanted the
foundation as the object of the settlor's bounty, in favor of
others, without adequate investigation into the circum-
stances of the execution of the amendatory instruments and
without notice to the foundation. The areas of factual
dispute thus principally concerned the circumstances leading
up to Minnie Hey's execution of the 1960 and 1966 trusts
and her intentions and understanding at those times, and
the circumstances of her execution of the August and No-
vember, 1967, trust amendments and the September, 1967,
affidavit concerning the execution of the original trusts.

---

[9] The principal adversaries were the executor, Mr. Markell, and the foun-
dation, but there were roughly three dozen other persons or organizations
notified, many of whom became parties respondent and some of whom
played an active role from time to time in the proceedings. In this court on-
ly the respondents Kate Lewis and one Freda Assner (a beneficiary under
the November 14, 1967, will, whose mother had apparently provided a
home for Minnie Hey at the time of her immigration) filed a brief in addi-
tion to those filed by the executor and the foundation. Their consolidated
brief urges affirmance of the judgment voiding the 1960 and 1966 trusts.

[10] The trial on the merits consumed twenty-three trial days, spanning a
period from February 4, 1974, to April 23, 1974. The subsequent hear-
ings concerning counsel fees lasted six days, from February 23, 1976, to
August 9, 1976. The trial and fee hearings generated an appellate record
of nearly 8,800 pages, including exhibits.

### THE STANDARD OF REVIEW

The direct evidence bearing on these critical areas of factual dispute was largely documentary. Sidney Pfeifer and Minnie Hey were, of course, deceased; Mr. Markell was excused from testifying by reason of health; Kate Lewis did not testify; Mr. Loewenberg had been deposed but died before trial; as a result, the most direct evidence bearing on the instruments in question were the instruments themselves, the affidavit of Mrs. Hey, and the lengthy depositions of Mr. Markell and Mr. Loewenberg, all of which were introduced in evidence.

The fact that the evidence most directly relevant to the areas of dispute is preponderantly documentary has led us to consider whether the appropriate standard of review should be the relatively intrusive standard often invoked where the evidence is documentary, and it is said that an appellate court stands in as good a position as the trial court to draw factual as well as legal conclusions from the relevant documents. See *Stamper* v. *Stanwood*, 339 Mass. 549, 551 (1959); *Brophy* v. *School Comm. of Worcester*, 6 Mass. App. Ct. 731, 733 (1978).

That test, or standard of review, is not appropriate to the present case, for two reasons. First, the cases where it is applied often involve what is essentially a case stated, where the facts of the case are not in dispute, and the relevant question concerns the application of the law to undisputed facts (see, e.g., *Tucci* v. *DiGregorio*, 358 Mass. 493, 493-494 [1970]); or they involve inferences or conclusions of facts from undisputed primary or subsidiary facts (as in *Stamper* v. *Stanwood, supra*), in which event review is analogous to a court's drawing inferences of fact from the subsidiary findings set out in a master's report (see *O'Brien* v. *Dwight*, 363 Mass. 256, 281 [1973]; *Jones* v. *Gingras*, 3 Mass. App. Ct. 393, 395-396 [1975]; *Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 283 [1976]). The present case, by contrast, concerns issues of veracity arising on conflicting written testimony, where the judge was not obliged to accept, for

example, the assertion in Minnie Hey's affidavit (contrast *Farley* v. *Sprague*, 374 Mass. 419, 423-424 [1978]) that she did not understand that the documents she signed in 1960 and 1966 were irrevocable trusts. The appropriate test in such a case is, we think, the test mandated by Mass.R.Civ.P. 52(a), *supra*, that "[f]indings of fact shall not be set aside unless clearly erroneous," not because we stand in a position dissimilar to that of a trial judge in evaluating the written testimony, but because the appellate function should be directed as a general rule to the correction of error, not the finding of facts; and the fact that an appellate court might resolve a question of conflicting written testimony in a particular manner does not make the trial judge's different resolution of the same question clearly erroneous.

A second compelling reason is that the findings by the judge involved some consideration, at least, of oral testimony adduced in court, which she was obviously in a better position than we to evaluate. The most striking example is the testimony of Mr. Mugel to the effect that he had thoroughly explained the terms of the 1966 trust to Minnie Hey at the brunch meeting in Buffalo in the summer of 1966, eight weeks before she signed it. Another example is the testimony of Max Gidez to the effect that he had advised her in later 1959 or early 1960 that there was nothing wrong with signing a trust so long as it was revocable, coupled with her note to him after signing the 1960 trust suggesting that she thought she had followed his advice. In a more general way much of the oral testimony adduced at trial fleshed out the characters of Minnie Hey and Sidney Pfeifer, illuminated the relationship between them, and bore on such intangible but telling factors as her acumen in practical affairs, particularly her experience in matters of property and money management, and the likelihood that Pfeifer's involvement in her fortune arose from protective rather than selfish impulses. This is not a case, therefore, where the oral testimony "consists almost entirely of explanations and descriptions of the documentary evidence," *Stamper* v. *Stanwood*, *supra*; rather, the oral testimony, while not for the most

part focussed specifically on the legally operative events in the case, supplies the background against which it becomes possible to draw inferences supplementing and explaining what little we know by way of direct evidence of the actions of the key participants at the times of those events.

We stated earlier, quoting from *Louis Dreyfus & Cie.* v. *Panama Canal Co.*, 298 F.2d at 738, that "[i]f the decision depends directly on two or three issues that are clearly drawn, it will be clear that the judge must have focussed on those questions before reaching his decision, and therefore it can readily be assumed that the findings [although prepared by counsel] accurately reflect his convictions." The instant case falls within that principle: Despite the volumes of evidence adduced, the factual issues in the case were understood from the outset to turn simply on the state of Minnie Hey's intentions and understanding at the times she executed the trusts in 1960 and 1966 and at the times she executed the trust amendments in August and November, 1967. It is clear that the judge accepted the executor's contentions on these crucial points; that is, she accepted the view that Minnie Hey did not execute the trust amendments as a result of undue influence by Mr. Markell and Kate Lewis, and she accepted the view that Minnie Hey did not understand at the time she executed the 1960 and 1966 trusts that she was alienating the trust property from her individual control. Having decided these ultimate issues of fact — facts which do not derive by a deductive process from articulable subsidiary facts but rather represent a conclusion on all the evidence that certain crucial assertions in the affidavit of Minnie Hey and, to a lesser extent, in the depositions of Mr. Loewenberg and Mr. Markell were truthful — it was not improper for the judge thereafter to seek the assistance of counsel for the party in whose favor those crucial issues of veracity had been decided to organize a set of narrative-type findings in a manner consistent with the judge's pivotal decision that Minnie Hey's affidavit was credible. Moreover, although the judge did not extensively rework the submitted findings, she omitted three of the numbered submit-

ted findings from her own findings, deleted portions of two others, and amended three others in a substantial manner before adopting them. In these circumstances we see no reason to accord to her findings less than the weight we customarily give to the findings of trial judges, provided that they meet the standard of rule 52(a).

### The Evidence Concerning the Execution of the 1960 and 1966 Trusts

We turn, therefore, to an examination of the foundation's contention that the judge's crucial finding that Minnie Hey did not understand the nature of the 1960 and 1966 trusts was clearly erroneous.

The foundation bases its argument in this connection chiefly on the evidence from which the judge might have drawn a contrary conclusion. There was evidence that at the time of the execution of the 1960 trust in Palm Springs Minnie Hey was sick only in the sense that she was recuperating from painful fractures, that her mind was wholly sound and she was fully alert. There was evidence that, despite her generally high intelligence, she had a need for a protective trust due to a demonstrated propensity for making sizable gifts to persons around her and due to the somewhat impulsive nature reflected in her successive wills.[11] There was evidence which, if believed, would justify a finding that some of her friends were in fact prepared to take advantage of her improvidence in financial affairs. There was evidence that she had come by 1960 to think of Sidney Pfeifer, her closest living relative, as her natural heir and

---

[11] In addition to her offer to make Mr. Markell her residuary legatee after she had met him in a professional capacity only two or three times, and the sizable bequests to him and his family members included in the 1945 will, the record discloses that, at an earlier time, she had wanted to leave the residue of her estate to Max Gidez, her accountant; that she in fact made gifts of stock to him and sizable gifts to Kate Lewis; that she promised $50,000 to one Modestino Torra, an upholsterer who was a casual acquaintance. In 1967 she offered a sizable bequest to Mr. Loewenberg, who refused to include it in the will he was drafting.

that she intended, as indicated by the simple wills she had had prepared in 1959 by Mr. Landau, to leave the greater part of her estate to him. The evidence was void of any suggestion that those wills were other than her voluntary, uninfluenced act. There was evidence, accepted by the judge, that she had complete confidence in Sidney Pfeifer to manage her financial affairs; that she knew and told various persons in 1960 and thereafter that she had put her money in a trust; that she used a checkbook thereafter which indicated, after her signature, that she signed as trustee; that Max Gidez prepared, and she signed, fiduciary income tax returns in 1961 and thereafter; that in 1961, 1962, and 1963 she signed instruments ratifying the 1960 trust and transferring her remaining stocks into the trust; and that at some time after the signing of the 1960 trust, probably in 1966, the securities which had been in Minnie Hey's custody in a Boston bank vault had been transferred on the corporate books, that the securities were thereafter kept in Buffalo, and that Minnie Hey received the trust income by means of periodic checks from Sidney Pfeifer. There was testimony by Max Gidez to the effect that, after she had transferred the last of her stocks into the trust in 1963, he told her that her estate would no longer be able to honor the bequests listed in her will, that she became momentarily angry with Sidney and telephoned him to discuss it, and that she thereafter made no attempt to reverse any of what had been done. There was, as mentioned earlier, the testimony of Mr. Mugel that, in September, 1966, before Minnie Hey and Sidney Pfeifer executed the trust in favor of the Pfeifer foundation, Mr. Mugel had fully explained to her all its provisions. There was also evidence that, after Pfeifer's death, she stated on many occasions that her money was going to the foundation. In light of this and other testimony, the judge was plainly not compelled to take at face value Minnie Hey's assertion that she had not read or understood the import of the documents of trust in 1960 and 1966. And, in general, a fact finder should be somewhat skeptical of an assertion that a settlor did not understand the significance of a trust which

(in contrast to a will, for example) became immediately operative and in accordance with the terms of which the settlor conducted his or her financial affairs without serious question or complaint for many years.

But our primary focus, of course, must be on the evidence which tended to support the conclusions drawn by the judge; and in so doing we find that much of the evidence recounted above is compatible with those conclusions. Starting at a common point, Minnie Hey's demonstrated improvidence and her need for a protective trust, the judge was warranted in taking the view that Sidney Pfeifer was himself one of those from whom she needed protection. The evidence warranted her finding that "Pfeifer engaged in a conscious effort to gain his aunt's attention and to influence her in making inter vivos gifts to him and to leave her estate to him on her demise," and we can only regard it as remarkable that during the 1950's she should have given away roughly a third of her estate to a nephew who had not been close to her before that time. There was evidence that the 1960 trust was Pfeifer's idea and that the idea was conceived and carried to execution in considerable haste, at a time when Minnie Hey's injuries and her distance from familiar surroundings may have tended to make her dependent on Pfeifer and when those upon whom she had relied in the past for advice concerning the management of her financial affairs were relatively inaccessible to her. According to her affidavit, which the judge could and did accept as truthful, she knew that she had entrusted the management of her securities to Pfeifer but she did not know that she had put them beyond her recall. Certain of her letters substantiate the latter. Shortly after signing the 1960 trust she wrote to Max Gidez, "It will not make any difference in my income and I shall be able to do as I always have. It is still my holdings. I feel he [Pfeifer, apparently] is as honest as the day . . . ." Gertrude Remmes, the housekeeper, testified that Pfeifer had assured Minnie Hey (in 1967, after the signing of the second trust and the transfer of the securities to Buffalo) that the securities and the money were there for her whenever she wanted

them. She continued to refer to the principal of the trusts as "my money" or "my securities." There was evidence that she was not given copies of the 1960 or 1966 trusts and that she was always under the impression that she could dispose of her securities by gift or by will.[12]

The most telling evidence, of course, was the affidavit sworn to by Minnie Hey on September 26, 1967. The foundation argued before the judge and before us that this case was "a lawyer's document," written by Mr. Loewenberg and subscribed by Minnie Hey in anticipation of litigation, and was entitled to little or no weight. The judge, however, accorded it great weight, and the fact that she did so is, we think, a tribute to the work of Mr. Loewenberg, whose various memoranda and notes concerning his dealings with Minnie Hey were admitted in evidence and exhibit a high standard of professional objectivity as well as a meticulous concern that any documents he prepared for her signature were thoroughly understood by her and accurately represented her thinking. His notes faithfully record her times of confusion as well as her times of altertness; her periods of agitation and uncertainty as well as those of serenity and decisiveness; his probing and the reasons she gave for her decisions. He was acutely conscious, for example, of the possibility that Minnie Hey was being influenced inordinately by Kate Lewis during the period of the discussions leading to the November 14, 1967, trust amendment and new will which principally favored Kate Lewis and her family. Here Mr. Loewenberg deliberately and judiciously dragged his heels, requiring meetings and discussions, probing always for indications of influence, so as to be sure that the changes represented her wishes. We mentioned earlier that he timely but gently turned away her twice-proffered pecuniary bequests to him. From all indications, his performance (like that of his partner Mr. Powers at an earlier

---

[12] Max Gidez testified that he spoke to Pfeifer about Minnie Hey's misimpression, and Pfeifer replied that "he would provide for whatever there was in Mrs. Hey's will providing people who were beneficiaries did not cause him any trouble — words to that effect."

stage of Minnie Hey's estate planning) set a worthy example of professional probity and skill.

Turning to the affidavit of September 26, 1967, we can see from Mr. Loewenberg's elaborate notes of his antecedent conversations with Minnie Hey that the statements made in the affidavit were not his thoughts but hers. They are a faithful reproduction of the story she originally told him of the events surrounding the signing of the trusts. The critical portions of the affidavit concerning the execution of the 1960 and 1966 trusts are as follows: "My nephew Sidney, who was a lawyer and in whom I at all times had the utmost confidence, told me that there were certain documents which I should sign in connection with my property. One of these was a will and the other document I understood to have something to do with my securities and which enable Sidney to hold them for my benefit . . . . I did not read any of the documents prior to signing them and until very recently I had never seen a copy of the trust agreement which I apparently signed on February 25, 1960. In signing the trust instrument I assumed that I was signing a paper which was necessary for Sidney to hold my securities for my benefit and I did not in any way intend to give up the ownership or the right to dispose of my property . . . . In the fall of 1966 . . . my nephew Sidney . . . told me that it was necessary that we go to the Copley Square office of the State Street Trust Company in connection with the transfer of some securities. At the bank we met the bank manager, Mr. McCormack, and Sidney presented a document for me to sign. Both he and I signed the document and Mr. McCormack witnessed it. I did not read the document at the time but, again relying on Sidney, understood that it had something to do with the management of my securities. I did not intend by signing the document to give up the ownership or my right to dispose of my property . . . . My nephew died in June of this year and after his death I learned for the first time the provisions of the trust agreement which I had signed at the State Street Bank on October 24, 1966." [13]

---

[13] Minnie Hey's affidavit was silent as to the meeting with Mr. Mugel in a Buffalo hotel over brunch, at which, Mr. Mugel testified, he had

It would unduly lengthen this opinion to set out all the evidence supporting the conclusions drawn by the judge. Much less would it serve a useful purpose to set out in further detail the contrary evidence. There were at least three distinct hypotheses open on all the evidence: (1) that Minnie Hey had in fact understood the import of her actions in signing the trusts but decided after Sidney Pfeifer's death that she would like to regain full control of her money — in short, that she had lied to Mr. Loewenberg and others; (2) that Minnie Hey had understood, at least in a general way, the significance of the trusts at the times of their executions but in the period from Pfeifer's death to her own was confused and forgetful and subject to undue influence of friends who had a selfish interest in voiding the trusts — in short, that the trust amendments and corresponding wills and her various statements to Mr. Loewenberg were the product of efforts by those friends to take advantage of her confusion and weakness and overbear her will; and (3) that the statements in her affidavit of September 26, 1967, were substantially true, and that Sidney Pfeifer had either practiced a fraud on her in obtaining her signatures to the trusts, or at least had failed to ensure that she was fully aware of the nature and consequences of her acts. No one contended for the first hypothesis; the evidence offers nothing substantial to corroborate a supposition that Minnie Hey may have been a fundamentally dishonorable person. There was evidence to support the second hypothesis, which was the view

---

explained the provisions of the 1966 trust to her. His testimony was weakened by cross-examination in which Mr. Mugel acknowledged that Minnie Hey had asked no questions during his explanation and which gave some basis for concluding (as the judge did) that his explanation may have been so technical that she did not comprehend it. For this deficiency (assuming it to be true) Mr. Mugel may not have been to blame: he doubtless had every reason to assume that she was aware of the legal effect of the 1960 trust, and the 1966 trust took nothing from her that she had not already given up by executing the earlier trust. The purpose of the 1966 trust was merely to save estate taxes by having the corpus of Minnie Hey's trust pass directly to Pfeifer's foundation rather than to Pfeifer and then to the foundation. In these circumstances Mr. Mugel may well have conceived of his explanation largely as a courtesy to a nonmanaging cotrustee.

of the facts urged by the foundation; but this view is undermined by Mr. Loewenberg's extensive records which give no indication of influence by Mr. Markell and show the precautions he (Loewenberg) took to guard against undue influence by Kate Lewis. The foundation's view seems almost impossible to reconcile with the Loewenberg notes; it would almost seem to require a conclusion, not merely that Mr. Loewenberg was aware of the alleged scheme of undue influence, but that he was himself implicated in that scheme. That view, as we have indicated, seems less likely than that Minnie Hey was, as the judge found, telling the truth.

We hold, therefore, that the judge did not err in finding that Minnie Hey signed the 1960 and 1966 trusts without understanding that the legal effect of those instruments was to alienate the power she had theretofore enjoyed in her individual capacity to control and dispose of the trust assets as she might wish. It is important to note that that finding does not intimate fraud or deceit or undue influence on the part of Sidney Pfeifer. It does mean that he failed to ensure that she was fully aware of the legal implications of the documents he prepared for her signature.

### THE VOIDABILITY OF THE 1960 AND 1966 TRUSTS.

We turn next to the question of the correctness of the judge's ruling that, on the facts found, the 1960 and 1966 trusts were voidable. We start from the proposition, "settled in this Commonwealth, 'that a voluntary trust completely established, with no power of revocation reserved, cannot be revoked or set aside at the will of the person by whom and with whose property it was set on foot,' *Lovett* v. *Farnham,* 169 Mass. 1, 2-3 [1897], '. . . without proof of mental unsoundness, mistake, fraud or undue influence.' *Sands* v. *Old Colony Trust Co.,* 195 Mass. 575, 577 [1907], and cases cited." *Clune* v. *Norton,* 306 Mass. 324, 326 (1940), and cases cited. Here, we have no allegation of mental unsoundness on the part of Minnie Hey at the time she executed the 1960 and 1966 trusts, and the judge's findings

fell short of showing fraud or deceit on the part of Sidney
Pfeifer. Rather, the plaintiff argues that the judge's ruling
that the trust was voidable was properly grounded on the
law of mistake.

The validity of that view turns on whether a mistake suf-
ficient to warrant rescission of the trusts may be found in
the misconception by Minnie Hey that she retained the
power to control and dispose of the trust assets. Her assump-
tion that the trust was temporary, in the sense of being sub-
ject to recall, is essentially a misconception as to the revoca-
bility of the trust. In some circumstances a trust executed
with the mistaken impression that it is revocable is subject
to being declared void on complaint of the settlor. See
*Manha* v. *First Safe Deposit Natl. Bank,* 353 Mass. 750
(1967); *Ryan* v. *Brennan,* 1 Mass. App. Ct. 469, 474 (1973);
Restatement (Second) of Trusts §§ 332(1), 333 (1957).
4 Scott, Trusts §§ 332, 333, 333.4 (3d ed. 1967). And while
there is long-settled precedent for declaring rescission of an
instrument where the mistake was mutually held by the par-
ties to it, see e.g., *Reggio* v. *Warren,* 207 Mass. 525, 533-535
(1911); *Coolidge* v. *Loring,* 235 Mass. 220, 224-225 (1920);
*White* v. *White,* 346 Mass. 76, 79-80 (1963), it is now settled
that in the case of a trust, where the settlor receives no con-
sideration for its creation, a unilateral mistake on the part of
the settlor is ordinarily sufficient to warrant rescission. See
*Berman* v. *Sandler,* 379 Mass. 506, 509-510 (1980). That
principle is relevant, for there is no suggestion in the record
that Sidney Pfeifer, a lawyer of long experience, was at all
unclear as to the revocability of the trusts in question.

But our chief concern here is whether Minnie Hey's mis-
conception was a "mistake" of the type that would warrant
reformation or rescission of the trusts. A "party asserting
[mistake] must present evidence of an actual mistake and
cannot prevail on a showing of mere inadvertence on the
part of the [settlor]." *Ryan* v. *Brennan,* 1 Mass. App. Ct. at
474-475. 4 Scott, Trusts § 332, at 2626-2627 (3d ed. 1967).
"Misconception of the legal effect of the language used in
[an] instrument is not a 'mistake of law' against which our

courts afford a remedy. The parties are bound by the legal
effect of what has really been agreed on, and cannot have
the declaration set aside on the ground that they did not ful-
ly understand the legal effect of the language used, and that
certain legal consequences which were not anticipated by
the settlors flowed from its execution." *Coolidge* v. *Loring,
supra* at 224. The judge's findings, and the evidence on
which they were based, did not show that "there was [a]
mistake, in the sense that [the settlor] thought that the [de-
claration of trust] contained any other or different provision
than in fact it contained, and no accident in the sense that
anything was omitted which was intended to be put in . . . ."
*Taylor* v. *Buttrick,* 165 Mass. 547, 550 (1896). Contrast
*White* v. *White, supra* at 79-81. There is here no showing,
as there was in *Franz* v. *Franz,* 308 Mass. 262, 266 (1941),
that the instruments signed by Minnie Hey failed to express
with accuracy instructions given by her to the scrivener.
Rather, the settlor apparently accepted Sidney Pfeifer's ad-
vice that she should sign the documents in order to enable
him to manage her financial affairs for her, without demand-
ing or receiving an explanation of their contents. That was
not a "mistake," in the legally significant sense of the word.
One who knowingly signs a writing that is obviously a legal
document without bothering to ascertain the contents of the
writing is ordinarily bound by its terms, in the same manner
as if he had been fully aware of those terms, unless it can be
proved that he was induced to sign it by fraud or undue in-
fluence. *Farrell* v. *Chandler, Gardner & Williams, Inc.,*
252 Mass. 341, 343-345 (1925). *Lee* v. *Allied Sports Associ-
ates, Inc.,* 349 Mass. 544, 550-551 (1965). 3 Corbin, Con-
tracts § 607, at 660-662 (1960). See also *Fonseca* v. *Cunard
S.S. Co.,* 153 Mass. 553, 555-557 (1891). That he does not
know the terms that he is agreeing to is not a mistake, but a
conscious choice and a known risk. Such a document is not
ordinarily subject to rescission.

There is an exception to the foregoing principles, however,
where a person is induced to sign a legal document by one
standing in a fiduciary relation to that person and where the

fiduciary has an interest in the document's execution. In such a case, the document can generally be avoided by its signer on a showing merely that the fiduciary failed to make him aware of the legal significance of the signing of the document, provided that the rights of innocent third persons have not intervened. An example is *Webster* v. *Kelly,* 274 Mass. 564 (1931), where a deed by a client transferring a remainder interest in real estate to his attorney was voided because the attorney "did not see to it that [the grantor] was advised and . . . understood that her deed would not be revocable at her pleasure . . . ." *Id.* at 571-572. The rule is based on the principle that the fiduciary owes complete and undivided loyalty to the person towards whom he stands in such a relation and should not permit any other consideration to influence his actions or advice. Thus, it has been said that an attorney "who bargains with his client in a matter of advantage to himself must show, if the transaction afterwards is called in question, that it was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger." *Hill* v. *Hall,* 191 Mass. 253, 262 (1906). *Israel* v. *Sommer,* 292 Mass. 113, 122 (1935). *Goldman* v. *Kane,* 3 Mass. App. Ct. 336, 341 (1975). Similar principles govern analogous dealings in other fiduciary contexts, as, for example, in dealings between a trustee and a beneficiary of the trust. *Brown* v. *Cowell,* 116 Mass. 461, 465 (1875). It is manifest that Sidney Pfeifer's dealings with Minnie Hey in relation to the creation of the trusts cannot stand if they are to be measured by the standard applicable to the conduct of a fiduciary; for Sidney Pfeifer and the foundation that was

to perpetuate his name were interested parties to the execution of the trusts and, by the judge's findings, Sidney Pfeifer failed to make that fact, as well as the extent of her alienation of the trust assets, known to Minnie Hey.

The plaintiff argues that the relationship of Sidney Pfeifer to Minnie Hey was fiduciary as matter of law, because as regards the execution of the trusts he acted in fact as her attorney. It is true that the relationship between attorney and client, like those between trustee and beneficiary, director and corporation, guardian and ward, is fiduciary as matter of law, *Smith* v. *Smith,* 222 Mass. 102, 106 (1915); and that if an attorney or a member of his family is personally advantaged by a transaction with his client, the transaction is presumptively improper and voidable: the burden is on the attorney to prove that the transaction was fully understood by the client, that he attempted to have the client obtain independent advice, and that, if the client declined to receive independent advice, the attorney gave him forthrightly disinterested advice as to any aspect of the transaction which was arguably against the client's best interests. See *Hill* v. *Hall, supra; Smith* v. *Smith, supra; Israel* v. *Sommer,* 292 Mass. at 122-124; *Goldman* v. *Kane,* 3 Mass. App. Ct. at 340-342. But it is not invariably true that, when an attorney performs a legal service for another, a strict attorney-client relationship exists. Not infrequently an attorney will draft a will or do estate planning work for a relative or close friend and associate; and in such a case, if the attorney or a member of his immediate family is named as a beneficiary, a court called upon to examine the transaction, although it may suggest that the better practice would be for an independent attorney to do such work (see, e.g., *Frawley* v. *Snell,* 299 Mass. 398, 404 [1938]; *Ruczinski* v. *Russ,* 337 Mass. 514, 516 [1958]), and although it may state that such a transaction "should be viewed with great circumspection" (*Wood* v. *McDonald,* 332 Mass. 220, 222 [1955]; see also *Spilios* v. *Bouras,* 337 Mass. 176, 180 [1958]), will not apply to such a transaction the presumption of impropriety which is applied when dealing with one

whose fiduciary status is uncomplicated by ties of blood, marriage, or close friendship. For cases of family ties, see *Wellman* v. *Carter*, 286 Mass. 237, 248 (1934); *Frawley* v. *Snell*, *Wood* v. *McDonald*, and *Spilios* v. *Bouras*, all *supra;* compare *Ruczinski* v. *Russ*, *supra*. For cases of long-standing friendship, see *Tarr* v. *Vivian*, 272 Mass. 150, 153 (1930); *Slater* v. *Munroe*, 316 Mass. 129, 132 (1944); *Reilly* v. *McAuliffe*, 331 Mass. 144, 147-149 (1954). The reason for the distinction is that, in the case of an exclusively fiduciary relationship, it can reasonably be presumed that that relationship influenced the transaction (*Smith* v. *Smith*, *supra* at 106; *Israel* v. *Sommer*, *supra* at 123); and the policy of the law is to favor the fiduciary's duty of loyalty and to discourage business or donative transactions which inure to the personal benefit of the fiduciary. *Goldman* v. *Kane*, *supra* at 341. But where there is also a relationship of family or friendship, gifts or other acts of generosity are natural and to be expected; in such a setting the reason for the presumption of impropriety dissolves. *Smith* v. *Smith*, *supra* at 106-107. See *Frawley* v. *Snell*, *supra* at 403; *O'Brien* v. *Collins*, 315 Mass. 429, 431, 434-435 (1944). We agree with the foundation, therefore, that Sidney Pfeifer's status as Minnie Hey's next-of-kin and heir presumptive distinguishes this case from such cases as *Hill* v. *Hall*, *Tarr* v. *Vivian*, *Israel* v. *Sommer*, and *Goldman* v. *Kane*, all *supra*. There is here no presumption of impropriety, whether that result is rationalized by saying that the relation was not strictly that of attorney and client or by recognizing that an attorney-client relationship is not fiduciary as matter of law when there is an overriding relationship of family or friendship.

But that is as far as the cases relied upon by the foundation will take it. Apart from the strictly fiduciary relationships (trustee-beneficiary, executor-legatee, attorney-client, guardian-ward, etc.), the law recognizes the existence of fiduciary responsibilities arising out of other relationships of trust and confidence and provides a remedy against one who abuses the confidence reposed in him by another, turning it to his own advantage. *Reed* v. *A.E. Little Co.*, 256 Mass.

442, 448-450 (1926). *Cann* v. *Barry,* 293 Mass. 313, 316-317 (1936). *Stetson* v. *French,* 321 Mass. 195, 199-200 (1947). Such a relationship does not arise merely by reason of family ties. *Hill* v. *Hill,* 278 Mass. 44, 51 (1931). *Ranicar* v. *Goodwin,* 326 Mass. 710, 713-714 (1951). *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 112 (1959). *Meskell* v. *Meskell,* 355 Mass. 148, 151-152 (1969). Whether a relationship of trust and confidence exists is a question of fact, *Hayes* v. *Moulton,* 194 Mass. 157, 165 (1907); *Colburn* v. *Hodgdon,* 241 Mass. 183, 191-192 (1922); and may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters. *Hawkes* v. *Lackey,* 207 Mass. 424, 431-432 (1911). *Akin* v. *Warner,* 318 Mass. 669, 674 (1945). *Stetson* v. *French, supra* at 199. Compare *Kelly* v. *Kelly,* 358 Mass. 154, 156 (1970). Contrast *Parsons* v. *Parsons,* 230 Mass. 544, 550-551 (1918); *Cranwell* v. *Oglesby,* 299 Mass. 148, 152-153 (1937). "Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." *Cann* v. *Barry, supra,* quoting from *Tate* v. *Williamson,* L.R. 2 Ch. 55, 61 (1866). "The catalyst . . . is the defendant's knowledge of the plaintiff's reliance upon him." *Broomfield* v. *Kosow,* 349 Mass. 749, 755 (1965). "When confidence is reposed and accepted, the person trusted is . . . liable for concealing facts which by reason of the relationship he should disclose." *Reed* v. *A.E. Little Co., supra* at 449.

The case at bar is governed by the principles stated. Minnie Hey had the utmost trust and confidence in Sidney Pfeifer and relied on his judgment and integrity in committing to him the management of her securities. Taking advan-

tage of her confidence, he prepared or caused to be prepared the 1960 trust document and obtained her signature to it knowing that she had not read it and had no understanding of its far-reaching legal effects. We can assume that he intended it for her benefit as a protective trust; but he owed her a duty as a fiduciary personally interested in the execution of the document to disclose fully all adverse legal effects of the document or to cause her to obtain independent legal advice before execution. He did neither, permitting her to sign the document without knowing that she was thereby relinquishing control of the principal irrevocably. Again, in 1966 he obtained her signature to the replacement trust without ensuring that she understood its provisions. We recognize that she lost nothing by the 1966 document and that Sidney Pfeifer's interest (in the legal sense of the term) in the 1966 trust was less than his interest had been under the 1960 trust. But he nevertheless had a personal stake in the document, both because it gave him a contingent life interest in the income of the trust and because the principal was to be used to memorialize his name as a patron of the arts. Furthermore, as Minnie Hey was still unaware at the execution of the 1966 trust that she had divested herself of her securities, the 1966 trust is as vulnerable as the 1960 trust to rescission at Minnie Hey's behest due to Sidney Pfeifer's breach of his duty as fiduciary to disclose its terms to her.

It follows that the judgment was correct in so far as it declared the 1960 and 1966 trusts to be void. We emphasize that this result follows not merely from Minnie Hey's failure to understand that the trusts were irrevocable but from the breach by Sidney Pfeifer of the fiduciary duty he owed to her in the circumstances found to obtain. No separate contention is made that the 1966 trust should be declared void only to the extent of Sidney Pfeifer's interest, leaving the foundation's interest intact; but we think it most unlikely that such a contention could succeed in view of the relationship between Pfeifer and the foundation — a point discussed below. In view of our conclusion in this aspect of the case, it is unnecessary for us to consider the foundation's contentions relative to the validity of the trust amendments executed by Minnie Hey after Sidney Pfeifer's death.

## COUNSEL FEES

Following the trial extensive hearings were had concerning the award of counsel fees from the trust assets. The judge determined and ordered payment of fees for seven counsel. None of those awards are now in dispute. The judge further determined that the time claimed by counsel for the foundation was excessive, that a reasonable compensation for counsel for the foundation would be $65,000, but that the foundation was not entitled as of right to the payment of counsel fees from the trust. Finding that the litigation was necessitated by the improper conduct of Sidney Pfeifer, the judge declined to make any award of counsel fees to the foundation. The denial, as we interpret the judge's decision, was an exercise of discretion, not a denial as matter of law. The foundation alleges error both in the denial and in the computation of $65,000 as reasonable compensation.

The foundation first contends that the factual premise of the judge's denial: namely, that the litigation was necessitated by the improper conduct of Sidney Pfeifer, was erroneous, and that it was necessitated instead by the improper conduct of Mr. Markell and Kate Lewis. That avenue of attack is now foreclosed by the foundation's lack of success in overturning the judge's findings on appeal.

The foundation next contends that the foundation should have been awarded counsel fees under G. L. c. 215, § 39B, as appearing in St. 1975, c. 400, § 70, and that the judge's denial of such an award in effect reinstates the "benefit to the estate" rule disapproved (in its application to § 39B) in *First Natl. Bank* v. *Sullivan,* 4 Mass. App. Ct. 414, 421-423 (1976). Contrast *Karvonen* v. *Halmetoja,* 7 Mass. App. Ct. 855 (1979). That contention misunderstands the judge's order. The judge did not disapprove the allowance of counsel fees by reason of there having been no benefit to the estate. The sole reason given for disapproval was the improper conduct of Sidney Pfeifer.

General Laws c. 215, § 39B, does not require an award of counsel fees from the trust assets as matter of law; rather, in

relevant part, it states that "the probate court may, in its discretion as justice and equity may require, provide that such sums as said court may deem reasonable be paid out of the estate in the hands of such fiduciary . . . ." That exercise of discretion is subject to appellate review; but the discretion is vested by the Legislature in the Probate Court, and its exercise of discretion will be given weight on appeal. Compare *Frawley* v. *Snell,* 299 Mass. at 403; *Meskell* v. *Meskell,* 355 Mass. 148, 153 (1969).

We think that it would ordinarily be regarded as the duty of the trustees of a formally executed, irrevocable trust to resist a claim for rescission by the settlor, unless the beneficiaries of the trust should validly waive their interests in the trust. For performing that duty the trustees would ordinarily be allowed their expenditures for counsel fees and costs in their accounts. Where, as here, the trustees do not undertake the defense of the trust,[14] a beneficiary of the trust should, as a general rule, be allowed his reasonable counsel fees and expenses incurred in discharging that function; for his defense is equally a service to the trust, necessitated by the trustees' default. But if the execution of the trust is found to have resulted from the fraud, undue influence, breach of fiduciary duty, or other wrongdoing of the beneficiary, there should normally be no allowance made from the trust assets for his counsel fees and expenses in seeking to preserve the trust, for such an allowance would enlarge the wrong done to the settlor, and there is no equity in making the wrongdoer whole at the settlor's expense. Compare *National Academy of Sciences* v. *Cambridge Trust Co.,* 3 Mass. App. Ct. 314, 320 (1975), *S.C.,* 370 Mass. 303, 312 (1976).

The trial judge's denial of the foundation's application for counsel fees and expenses was an attribution of the wrong of

---

[14] When Minnie Hey filed her complaint, the two trustees were Minnie Hey herself and the bank. The latter filed an answer stating only that it "submits its rights to the determination of this Honorable Court, except that it specifically says that the [1966] Trust is valid and in full force and effect." The bank thereafter took no part in the litigation.

Sidney B. Pfeifer to the Sidney B. Pfeifer Foundation, Inc.
Such an attribution involves a factual determination, with-
in the sphere of the finder of fact, whose determination will
not be overturned on appeal unless the implied finding can
be said to be clearly erroneous. The evidence in this case
amply warranted such a finding. Sidney Pfeifer was clearly
the moving force behind the foundation. He caused the req-
uisite papers to be executed; the foundation bore his name;
the foundation depended for its substance entirely on the
funding which was to come to it from the Sidney B. Pfeifer
Trust and the Minnie Hey Trust. He was one of the five
trustees of the foundation; two of those trustees (he and Mr.
Mugel) were instrumental in the drafting and execution of
the Minnie Hey trust. Both participated in the explanations
to her which were determined by the judge to be so inade-
quate as to amount to a breach of fiduciary duty. In light of
those factors the judge could properly conclude that the
foundation's application for counsel fees should be governed
by the principles that would apply if Sidney Pfeifer himself
had sought such an allowance. The judge did not err in de-
nying the foundation's application for counsel fees and ex-
penses.

*Judgment affirmed.*