DAVID P. ISRAEL *vs.* EMMELINE R. SOMMER & others.

Middlesex.   April 1, 2, 1935. — September 13, 1935.

Present: RUGG, C.J., CROSBY, PIERCE, LUMMUS, & QUA, JJ.

*Contract*, Validity.  *Attorney at Law*.  *Equity Pleading and Practice*, Master: report of evidence, exceptions to report, findings.

Ordering or not ordering a master in a suit in equity to report evidence is within the discretion of the court though the motion therefor be filed before the master's report.

Under Rule 90 of the Superior Court (1932), a motion to recommit a suit in equity to a master for a summary report of evidence alleged to be needed to present a question of law, will be denied unless such

question of law has been raised by objections brought in to the master's report and the motion is supported by affidavit.

A finding of mixed law and fact made by a master in a suit in equity is final unless shown to be wrong by other facts or reported evidence.

An exception to a master's report in a suit in equity can be sustained only for error appearing on the face of the report.

Evidence should not be taken at the hearing of exceptions to a master's report in a suit in equity.

An attorney, hired primarily as such, owed a fiduciary duty to his employer, though he worked on a salary and had no outside office or practice, and part of his work was nonlegal.

A bargain between attorney and client will not stand except on proof by the attorney that in fact it was fair to the client and that the client had from the attorney or from competent outside counsel the sound, disinterested advice which the client ought to have had in dealing with a stranger.

BILL IN EQUITY, filed in the Superior Court on October 23, 1933.

After reference to and report by a master, the interlocutory orders and decrees described in the opinion were entered by *Walsh*, J., by whom the suit was reported for determination by this court.

*F. H. Stewart*, (*L. Black* with him,) for the defendant Emmeline R. Sommer, administratrix.

*A. P. Teele*, (*E. S. Farmer* with him,) for the defendants Hugo Stoltzenberg and another.

*J. M. Graham & A. S. Allen*, for the plaintiff.

LUMMUS, J.   The facts appear in a master's report confirmed by the Superior Court.   Adolph Sommer, born and educated in Germany, was a druggist in California, where he first studied and then taught in the State University at Berkeley.   There he discovered the formula from which he afterwards made his principal product, Viscol.   About 1890 he removed to Cambridge, Massachusetts, and opened a factory.   He lived alone, had no social relations, worked an unusual number of hours every day, never took a vacation nor allowed his employees to take any, permitted no conversation or coöperation among his employees, and dominated the business absolutely.   He was "industrious, alert, keen, strong willed and stubborn."   Yet he was kind to his employees when they got into financial difficulties, and some of them remained many years in his employ.

In 1922, when seventy-one years old, Sommer married a widow of fifty-one, Emmeline R. Harnden, who had worked in the factory for more than twenty years. An antenuptial agreement in Sommer's handwriting was executed and recorded. By it their property at death was to "descend to their respective heirs at law or otherwise" in accordance with their wills. When Sommer was murdered by robbers on October 20, 1933, his legal heirs, apart from his widow, were two children of a deceased sister in Germany.

As early as 1914 Sommer employed a lawyer to work at the factory and give all his time to the business, which Sommer conducted under the name of Viscol Company. Various lawyers served in that capacity for periods ranging from a few months to five or six years. In addition, he retained at times lawyers practising in their own offices to handle special matters.

In December, 1926, Sommer bought a farm near Lowell, which he called Colab Farm. On the farm were old factory buildings. He had in mind removing his factory at some time to the farm, and also living on the farm when he should retire from business. His investment in the farm, and his losses in its operation, amounted to $200,000. Business at the factory began to be poor as early as 1931, his accumulated savings in banks had to be used to meet his obligations, and in the latter part of 1932 and 1933 some of his debts remained unpaid.

During 1928 and 1929 Sommer was anxious to find a person who in character, ability, industry and initiative was fit to assume executive responsibility and to succeed to the management of the business when Sommer should retire. About the middle of October, 1929, Sommer answered an advertisement inserted in a newspaper by the plaintiff to the effect that a "law trained man seeks opening in mercantile or manufacturing house." Correspondence and interviews followed. Sommer told the plaintiff that he wanted a man with legal training to learn all about the business and eventually to manage it when Sommer should retire. In view of the prospects, the plaintiff accepted the position at $30 a week.

The plaintiff was born in London in 1896. When he was six, he came to this country, attended school in Salem, Massachusetts, and later went for a time to the high school. He then worked for his father in buying and selling upper leather, and in other business. In 1916, while still working, he began to attend a law school. He was admitted to the bar in 1921, and practised at Salem until a few weeks after he went to work for Sommer, when he gave up his office at Salem and moved to Boston, in order to be near the factory.

About the time when he moved to Boston, the plaintiff told Sommer that he was working for small pay and losing his opportunities in practice, and ought to be protected by a definite arrangement. Sommer agreed, saying that he thought the plaintiff would be a satisfactory man. A partnership and a corporation were both considered, but Sommer decided that he wished a "living trust" formed, and told the plaintiff to wait, before trying to draft any instrument, until the plaintiff and Sommer could sit down and go carefully into the matter. The plaintiff objected that that might occupy months, and in the meantime he would be left unprotected. He obtained permission to draw an agreement which would give him some feeling of security. Twelve or fifteen successive drafts of such an agreement were made, and all were carefully studied and corrected by Sommer. On February 1, 1930, an agreement was executed. By it, the plaintiff agreed to devote himself to the business at a salary of $50 a week. Sommer agreed that, when he should die or retire, that all his property should be conveyed to the plaintiff, the plaintiff paying to Sommer during his lifetime and to his widow after his death half the net profits of the estate and business. Liquidated damages for breach were established at $100,000 for breach by Sommer and $5,000 for breach by the plaintiff.

This agreement was deemed not the final agreement between the plaintiff and Sommer, but only a stop-gap until a deed of trust could be prepared. By oral arrangement, the plaintiff drew only $35 a week as salary, notwithstanding the written agreement. Late in 1930 the

talk about the trust was resumed. Many successive drafts were prepared, studied by Sommer, and criticised by him. The final draft was agreed upon in the summer of 1931, but Sommer did not wish to sign it until after a mortgage to the East Cambridge Savings Bank should be executed and recorded on September 16, 1931. The trust instrument was signed on September 21, 1931. Sommer was reluctant to acknowledge it so that it might be recorded, for he wished it kept secret. But he did acknowledge it on November 9, 1932, before a notary public who happened to come to the factory to see the plaintiff. It was recorded on October 23, 1933, three days after Sommer's death.

The trust instrument purported to convey all Sommer's property, real and personal, to the plaintiff as trustee. Sommer "shall operate, manage and control the conduct of said business, as . . . heretofore, for a period of five years from the date hereof, or until" his death. By implication the trust property was to be used in carrying on the business. It was declared that Sommer intended "to perpetuate the business of Viscol Company through the said Trustee David P. Israel by means of this Trust." After his retirement from active management, Sommer was to be paid by the trustee "one half . . . of the net profits of said business, but not less than one hundred ($100.00) dollars each week in weekly payments during my life time." Apparently after Sommer's death, his wife was to receive $100 each week out of the net profits of the business during her lifetime, and also $10,000 in cash within one year after Sommer's death, provided she would accept the provisions of the trust instrument within thirty days after Sommer's death. The trustee was to receive "such salary and compensation for the management and operation of said business as in his judgment is fit and proper."

The trust was to continue for twenty years after the death or retirement of Sommer. At the end of that period, the plaintiff was to have, as his own, half the trust estate, which half was to include at a nominal valuation of one dollar all the patents, trade marks, secret processes, formulas and the good will of the business. The other half

was to go to Sommer's heirs at law living at the end of the period, and in default of heirs to the Reis Library of the State University at Berkeley, California. Sommer reserved the right to revoke the trust at any time before his retirement or death, but not after five years. The plaintiff or his estate was to be entitled to liquidated damages in the sum of $100,000 if he "should fail to obtain the full and entire benefits of this Deed of Trust as is herein provided within the said five year period from this date, or if said Trustee should die or become totally incapacitated from doing work prior to the said expiration of said five year period."

Before execution of the trust instrument, Sommer took it, with the approval of the plaintiff, for the purpose of obtaining independent advice concerning it, kept it several weeks, and then returned it to the plaintiff, saying that he had consulted someone about it and had found that it was just what he wanted. The master finds in substance that the plaintiff had explained honestly to Sommer the meaning of every provision of the trust instrument. There is no suggestion that the plaintiff did not work faithfully as long as Sommer lived, or that Sommer ever became dissatisfied with the transaction. Sommer never lost his mental power, but until his death remained keen, alert and continuously in control of the business.

The master finds that there was no undue influence or violation of duty on the part of the plaintiff, and that the execution and delivery of the trust instrument was the free act of Sommer, unless a violation of duty necessarily follows as matter of law from the facts stated in the report.

On October 23, 1933, the plaintiff brought this bill against Emmeline R. Sommer, who had taken possession of the property and business as administratrix, to restrain her from interfering with his right of possession as trustee. She answered both individually and as administratrix, as did the nephew and niece in Germany who intervened as defendants, being heirs of Sommer. Apparently a receiver was appointed. The master's report was filed on May 21,

1934. Exceptions of the defendants were overruled, and the report was confirmed. Their motions to recommit were denied. Appeals were taken, and bills of exceptions allowed, relating to these procedural matters. The Superior Court, on September 7, 1934, entered an interlocutory decree adjudging that the plaintiff is "entitled to the possession of the property described in the trust agreement" and ordering that the defendant administratrix be "enjoined and restrained from interfering with the plaintiff's right of possession" thereof. All the defendants appealed. The judge then reported the case to this court.

The procedural questions present no great difficulty. There was no error in the denial on March 5, 1934, of the motion filed on December 21, 1933, that the master be ordered to report the evidence. This was discretionary, even though the motion was filed before the report. *American Agricultural Chemical Co.* v. *Robertson*, 273 Mass. 66, 80. The defendants appealed from the denial on June 26, 1934, of motions to recommit the report for the purpose of requiring the master to report a brief, accurate and fair summary of evidence said to be necessary for the purpose of presenting questions of law, under Rule 90 of the Superior Court (1932). The motions to recommit, in setting forth the evidence desired, do not refer to the objections in such a way as to show that the alleged questions of law to which the evidence relates were actually raised by objections brought in under that rule. Neither is there any affidavit, showing what would constitute a "brief, accurate and fair summary" to be appended to the report. No error is shown by the record. *Pearson* v. *Mulloney*, 289 Mass. 508, 512, 513. As to the objections to the report brought in by the defendants and appended to the report, which became exceptions by force of the rule cited, all of them fall under the familiar principles of practice that a conclusion of fact by a master, though it contains an admixture of law, must stand in the absence of conflicting subsidiary facts or evidence (*MacLeod* v. *Davis*, 290 Mass. 335, 338), and that an exception to a master's report can be sustained,

not upon the assertions of counsel, but only upon a showing of error by the record itself. *Zuckernik* v. *Jordan Marsh Co.* 290 Mass. 151, 155.

The defendants introduced in evidence before the master an application for a mortgage loan, made by Sommer to a Federal Land Bank on August 2, 1932, in which Sommer stated with the consent of the plaintiff, as the master found, that Sommer was the owner of the property, although under the plaintiff's theory the title had already passed to him as trustee. Sommer was always desirous of keeping secret the existence of the trust. The nineteenth objection and exception to the master's report declared that the finding of the master as to this application was "vague, indefinite, incomplete, ambiguous and misleading in that it fails to indicate and set forth other important and material facts and statements contained in said application," which facts and statements, as set forth by the defendants, appear only to emphasize, but not to add to, the statement of ownership reported by the master. At the hearing on the exceptions to the master's report, the defendant administratrix offered in evidence the application, "to which the plaintiff objected upon the ground that the court had no authority to receive evidence at a hearing upon the overruling of objections and the confirmation of a master's report, whereupon the court upon such ground, [*sic*] the court excluded said document, and saved this defendant's exception to such ruling." The ruling was right. The hearing was merely upon exceptions to the report, which must be based exclusively upon the face of the report. *O'Brien* v. *Keefe,* 175 Mass. 274. *Zuckernik* v. *Jordan Marsh Co.* 290 Mass. 151, 155. The taking of evidence at such a hearing would be incongruous.

The master finds "that during the period when the conversations between Sommer and the plaintiff took place with relation to the execution of the trust instrument, and when the trust instrument was executed and delivered, Sommer did not rely upon the plaintiff to give him, Sommer, the usual advice that an attorney gives to a client, and that

the plaintiff was then acting wholly under the direction of Sommer, and that there existed no relation of attorney and client between the plaintiff and Sommer in the usual meaning of said term, unless that relation necessarily follows as matter of law because of the work done by the plaintiff for Sommer in his business as hereinbefore set forth, *the plaintiff during those times not being a person independently practising the profession of the law but being solely an employee of Sommer and subject entirely to the direction and control of said Sommer.*" [Italics ours.] But the plaintiff was employed primarily because he was a lawyer, and was engaged largely in legal work for Sommer. Office work, as well as appearance in court, may be included in the practice of law. *Opinion of the Justices*, 289 Mass. 607, 613, 614. Nothing in the report, except the passage just quoted, tends to support the proposition that the plaintiff's status as attorney for Sommer ever changed. *Hill* v. *Hall*, 191 Mass. 253, 266. The plaintiff's stationery declared that he was counsel for the Viscol Company, which was Sommer. He admits that he explained to Sommer the legal effect of every provision of the trust instrument. It is not to be presumed that Sommer placed no reliance upon the explanation. It may be that an attorney, consistently with his official duty, cannot become completely the servant of anyone. See *Bergeron, petitioner*, 220 Mass. 472, 477; *Pearl* v. *West End Street Railway*, 176 Mass. 177, 179; *McDermott's Case*, 283 Mass. 74. But the facts that the plaintiff was employed at a weekly salary, instead of practising law in his own office, and that in part he was being trained to manage the business, did not make the relationship other than that of attorney and client, or absolve the plaintiff from the fiduciary duties of an attorney. States, municipalities and private corporations often employ salaried attorneys who have no private practice and whose work overflows into the executive field. The finding hereinbefore quoted appears not to be one based upon evidence or basic facts not reported, but to be merely an erroneous conclusion from the facts stated in the words

in italics.   See *MacLeod* v. *Davis*, 290 Mass. 335, 338; *Kasper* v. *H. P. Hood & Sons, Inc.* 291 Mass. 24.

The case resolves itself to this: Do the subsidiary facts stated by the master show error in his conclusion that there was no fraud, undue influence or violation of duty on the part of the plaintiff in obtaining the execution of the trust instrument of September 21, 1931, or in the conclusion of the judge that the plaintiff is entitled to enforce that instrument?

In *Gibson* v. *Jeyes*, 6 Ves. 266, 271, Lord Eldon said, "An attorney buying from his client can never support it; unless he can prove, that his diligence to do the best for the vendor has been as great, as if he was only an attorney, dealing for that vendor with a stranger. That must be the rule. If it appears, that in that bargain he has got an advantage by his diligence being surprised, putting fraud and incapacity out of the question, which advantage with due diligence he would have prevented another person from getting, a contract under such circumstances shall not stand." Again he said (page 278), "if he will mix with the character of attorney that of vendor, he shall, if the propriety of the contract comes in question, manifest, that he has given her all that reasonable advice against himself, that he would have given her against a third person." In *Hill* v. *Hall*, 191 Mass. 253, 262, Sheldon, J., said, "the attorney who bargains with his client in a matter of advantage to himself must show, if the transaction afterwards is called in question, that it was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger." It is true, that the

attorney has no means of compelling the client to obtain independent advice. But unless it appears that the presumed influence resulting from the relationship has been neutralized, by completely unselfish advice from the attorney, by independent legal advice from another, or in some other manner, the attorney cannot expect his bargain to stand. Independent legal advice which is incompetent, or perfunctory, or given without adequate knowledge of the situation, will not suffice. *Webster* v. *Kelly,* 274 Mass. 564, 571, 572. *Inche Noriah* v. *Shaik Allie Bin Omar,* [1929] A. C. 127. See also *Lancashire Loans, Ltd.* v. *Black,* [1934] 1 K. B. 380; *Wright* v. *Carter,* [1903] 1 Ch. 27, 54, 55, 59. In this class of cases "the Court interferes, not on the ground that any wrongful act has in fact been committed by the donee [attorney], but on the ground of public policy, and to prevent the relations which existed between the parties and the influence arising therefrom being abused." Cotton, L.J., in *Allcard* v. *Skinner,* 36 Ch. D. 145, 171, approved in *Inche Noriah* v. *Shaik Allie Bin Omar,* [1929] A. C. 127, 133. See also *Manheim* v. *Woods,* 213 Mass. 537; *Dunne* v. *Cunningham,* 234 Mass. 332, 335; *Lanigan* v. *Scharton,* 238 Mass. 468; *Webster* v. *Kelly,* 274 Mass. 564, 571; *Whipple* v. *Barton,* 63 N. H. 613; *Demerara Bauxite Co. Ltd.* v. *Hubbard,* [1923] A. C. 673; *Pisani* v. *Attorney General for Gibraltar,* L. R. 5 P. C. 516. Compare cases where the attorney who drew a will was made a legatee. *Tarr* v. *Vivian,* 272 Mass. 150. *Wellman* v. *Carter,* 286 Mass. 237, 248.

Applying these principles to the present case, it becomes manifest that the trust instrument cannot stand. Under its terms, Sommer bound himself to pay $100,000 to the plaintiff or his estate "as liquidated damages and full compensation," in case the plaintiff should "die or become totally incapacitated from doing work" within five years, even though the event should happen within a week after the execution of the instrument. Such a payment would have borne no relation to any services performed by the plaintiff, and Sommer would probably have been ruined in the effort to raise the money. Again, though Sommer

reserved the right for a time to revoke the trust, the practical exercise of that right was apparently impeded by a provision requiring him to pay $100,000 for the disappointment which would thus be caused the plaintiff. Moreover, the compensation of the plaintiff as trustee was to be fixed by his uncontrolled judgment. It is unnecessary to carry farther the analysis of this remarkable document.

The plain duty of any attorney was to advise Sommer not to sign any such instrument. *Wright* v. *Carter*, [1903]. 1 Ch. 27, 57, 58. The plaintiff does not contend that he gave any such advice to Sommer, but says that he explained every provision. That was not enough. If the plaintiff himself failed to comprehend the dangers to Sommer that lay in the instrument, that cannot make it valid. The plaintiff was bound to see that Sommer had unselfish and competent advice. The report fails to show that Sommer had independent legal advice of any sort. It shows merely that Sommer consulted someone, probably a banker now deceased. These facts control the general finding of the master that there was no undue influence or violation of duty. Very likely the plaintiff deserved some provision from Sommer, and Sommer intended to make one for him. But the instrument before us cannot stand.

It follows that the exceptions are overruled, that the interlocutory decrees are affirmed, except the decree of September 7, 1934, which adjudged that the plaintiff is entitled to the possession of the property described in the trust instrument, which decree is reversed, and that, after the accounts of the receivership shall have been settled, a final decree is to be entered dismissing the bill with costs.

*Ordered accordingly.*