JOANNE H. GRAVES & others[1] *vs.* EBEN HUTCHINSON, JR.

No. 94-P-665.

Suffolk. October 18, 1995. - January 23, 1996.

Present: PERRETTA, KASS, & IRELAND, JJ.

*Deed*, Alteration, Rescission, Delivery. *Fiduciary*. *Attorney at Law*, Fiduciary duty, Attorney-client relationship. *Practice, Civil*, Attorney's fees, Costs, Appeal.

In an action seeking rescission of a deed, the grantee's alteration of the date of the conveyance for purposes of misleading the taxing authorities, did not alter the legal effect of the deed and there was no error in the judge's finding that an effective delivery of the deed took place. [639-641]

In an action seeking rescission of a deed, the judge correctly concluded that an attorney breached no fiduciary duty in drafting a deed for his mother to convey to him certain real property and that in the circumstances there were no other breaches of fiduciary duties which would warrant setting the conveyance aside. [641-645]

Where a defendant in a civil action seeking attorney's fees and costs under G. L. c. 231, § 6F, failed to file his appeal with the single justice as required by G. L. c. 231, § 6G, the appeal was dismissed. [645]


CIVIL ACTION commenced in the Superior Court Department on March 3, 1989.

The case was heard by *Patrick J. King*, J.

*Robert J. Rutecki* for the plaintiffs.

*Sheldon Newman* for the defendant.

IRELAND, J. The plaintiffs are seven grandchildren and four great grandchildren of the defendant's mother, Hazel Hutchinson (Hazel); they are also the nieces, nephews,

---

[1] Kirk Frazee; Zane Scott Frazee; Elaine H. Harrington; Janet C. Maggio; Lisa Sequin; James T. Sullivan; Kenneth Frazee, III; Sara Frazee; and Nicholas and Heather Frazee, by their next friend Barbara Frazee.

grandnieces, and grandnephews of the defendant, who is Hazel's only surviving child.

Following Hazel's death in 1988, the plaintiffs filed an action in the Superior Court seeking rescission of a deed drafted by the defendant, an attorney, by which Hazel conveyed absolute title to certain real property she owned in Nantucket to the defendant, subject to a life estate she had reserved to herself. In their complaint and at trial, the plaintiffs sought to set aside the conveyance claiming that the defendant fraudulently induced Hazel into executing and delivering the deed. In the alternative, the plaintiffs sought to have a constructive trust in their favor imposed upon the Nantucket property, based on their claim that the defendant committed a breach of fiduciary obligations owed to Hazel at the time he drafted the deed and, later, when he accepted delivery of the deed. Following a nine-day jury-waived trial, a judgment was entered dismissing the plaintiffs' claims.

On appeal, the plaintiffs argue that the conveyance should have been set aside on the ground that the defendant was in breach of a fiduciary obligation of active diligence that is imposed upon an attorney, even when the transaction involves family members. The plaintiffs also claim that the deed was invalid on its face because it was materially altered by the defendant. The defendant has appealed from so much of the judgment as dismisses his counterclaim seeking costs and attorney's fees pursuant to G. L. c. 231, § 6F. We affirm.

We recount the facts as found by the trial judge, which we accept unless they are clearly erroneous. Hazel had three children, of whom the defendant is the youngest and the only survivor. The first two, James T. Sullivan (James) and Margaret E. Sullivan (Margaret), were the product of Hazel's first marriage to William F. Sullivan. The plaintiffs are the children and grandchildren of James and Margaret. Shortly after Margaret's birth, Hazel divorced William and married the defendant's father, Eben Hutchinson (Eben, Sr.), a conveyancing attorney. The defendant was born in 1923 of this marriage.

Until he was eleven years old, the defendant thought he was an only child and knew nothing of the existence of his two older half-siblings who had lived exclusively with their father. In about 1934, James and Margaret came to live with their mother, Hazel; Eben, Sr.; and the defendant in Medford. The evidence shows that Eben, Sr., accepted the two as though they were his own children and that he was their primary source of support. Later, when Margaret and James were well into their adulthood, Eben, Sr., adopted them. He treated all three children equally, both in his estate plan and through reciprocal wills with Hazel by which all assets were to be divided equally amongst the three children or their heirs upon the death of the surviving spouse.

Eben, Sr., died in 1958. James died in 1970, and Margaret in 1977. In 1957, at age thirty-four, the defendant became licensed as an attorney and joined his father's real estate conveyancing practice. He continued this practice after Eben, Sr.'s, death. Beginning in the mid-1960's, the defendant experienced severe bouts with alcoholism which continued until about 1976 when he became a recovering alcoholic. Partly as a result of his excessive drinking, the defendant's law practice suffered and, in 1976, he began phasing out from the active practice of law.

At this same time, he turned to Hazel for support and lived with her in her Medford home from 1976 to 1979. At Hazel's request, he took over managing her personal and business affairs which consisted mainly of handling her Nantucket real estate holdings. As Hazel had done since Eben, Sr.'s, death in 1958, the defendant arranged for the repair and maintenance of the various rental properties, solicited rentals, and collected the rents, which he always turned over to Hazel.

The defendant, along with Hazel, spent about six months of each year in Nantucket. Following the defendant's third marriage in 1979, and the birth in 1980 of his youngest child, Lois Marie Hutchinson, Hazel constructed a cottage on her property on Lily Street, Nantucket, for the exclusive use of the defendant and his family. The balance of the year,

the defendant and his family spent in their home in Chelsea. Until her death, Hazel provided the defendant with primary financial support as she knew he lacked the ability to support himself. The evidence shows that Hazel was concerned for the defendant's welfare and that she was happy that he had successfully maintained sobriety. She also appreciated the job the defendant was doing in handling the Nantucket properties and most of her personal affairs and was relieved that she did not have to shoulder those responsibilities during her later years.

Hazel enjoyed close ties as well with her older two children until their deaths, and with her grandchildren, of whose accomplishments she was quite proud. Hazel was generous to her children and her grandchildren. Between 1970 and 1988, she gave gifts of money totaling more than $115,000 to her two older children and their children. Like the defendant and his family, Margaret's and James's families spent considerable time together with Hazel, both in Nantucket and in Medford.

The judge found, however, that the defendant resented his older siblings and, in particular, his father's having treated them the same as the defendant was treated. He was jealous, too, of Hazel's generosity toward them. He felt that they or their children were "mooching" from Hazel at his expense. For example, the defendant remarked during a family get-together in 1984 that his nieces and nephews should not be allowed to vacation in Nantucket by "mooching" from Hazel in her cottages there. The defendant made clear his negative attitude toward his nieces and nephews through several other like remarks.

Against this general backdrop, we describe the events which sparked the plaintiffs' lawsuit. On May 18, 1984, the defendant recorded in the Nantucket registry of deeds, a deed dated March 31, 1978, signed by Hazel, and notarized by an attorney, Raymond Stevenson. The deed conveyed absolute title to all of Hazel's Nantucket real estate to the defendant, subject to a life estate Hazel reserved for herself. The deed was prepared by the defendant. The parties agree

that Hazel's signature as it appears on the deed is genuine. The real estate, consisting of several parcels,[2] was by far Hazel's most valuable asset. At the time of her death in 1988, it was valued at between 2.25 and 2.5 million dollars. By contrast, the rest of her estate was valued at less than $500,000.

When Hazel died in 1988, no will was found. In her later years, she had often referred to a will and to the importance of having one. During their frequent visits to Hazel's house in Medford, several of the defendant's nieces had noticed a small black box in Hazel's bedroom closet containing the notation, "will H.H." To one of her grandchildren, Hazel had confided in November, 1984, that her will was in that box and that if anything happened to her, the defendant would take care of things. As a result of there being no will, Hazel's existing estate was distributed according to the laws of intestacy, and the defendant received a one-third undivided share. The estate was valued at approximately $435,000.

At trial, the plaintiffs maintained that Hazel had a valid will and that the defendant had destroyed it because, if produced, it would have shown a contrary intent on Hazel's part as to how the Nantucket property and the existing estate were to be distributed. These facts, if proved, would then bolster the plaintiffs' claim that the defendant had fraudulently induced or tricked Hazel into signing and delivering the deed to the Nantucket property.

In his memorandum of decision, the judge inferred that Hazel had indeed executed a will or codicil sometime between March, 1981, and May, 1984, that the defendant had prepared it for her, and that, later, the defendant probably destroyed it in order to receive an intestate share of Hazel's remaining estate (in addition to the Nantucket property which she had already conveyed to him). The judge concluded nonetheless that the facts and inferences concerning the missing will did not negate his finding concerning Hazel's donative intent that the defendant was to receive the Nan-

---

[2]The real estate includes an approximate seventeen-acre parcel with a farmhouse and a cottage, two smaller parcels on Lily Street, and a parcel with a single-family house in the Quaise section of Nantucket.

tucket property upon delivery of the deed to him. In effect, the judge concluded that, because all of the Nantucket property had been deeded to the defendant, her remaining estate would likely have gone under a will exclusively to the other two branches of her family and that the defendant destroyed the will to receive an intestate share of the estate in addition to the Nantucket property. We turn now to the plaintiffs' claims on appeal.

1. *Alteration of the deed.* For this appeal, the plaintiffs do not challenge the judge's finding that, when she executed the deed, Hazel intended to convey the property to the defendant and to reserve a life estate to herself. Rather, they maintain that the defendant materially altered the deed for the fraudulent purpose of avoiding possibly substantial gift or estate taxes on the property and that, therefore, the deed must be rescinded. We cannot agree.

There is compelling evidence to support the judge's finding that the defendant did in fact alter the deed by changing its execution date from March 31, 1981, when Hazel undoubtedly actually signed the instrument, to March 31, 1978, the date appearing on the recorded copy of the deed within the registry of deed's records.[3] The judge agreed with the plaintiffs' assertion that the defendant fraudulently altered the date, probably to avoid estate or gift taxes on the conveyed property. The defendant admitted at trial that, following the deed's execution, Hazel held on to the original until sometime in 1982, when she delivered possession of it to him. However, the judge found the defendant's testimony not credible on this point, and established the deed's delivery date as sometime "in early May, 1984," or shortly before the May 18, 1984, recording date.

Delivery of a deed is essential to its validity, and the deed becomes effective only at the time of its delivery. *Lexington v. Ryder*, 296 Mass. 566, 568 (1937). Eno & Hovey, Real

---

[3]The original deed was not produced at trial as the defendant claimed he had lost it. The judge concluded, however, that the defendant may have destroyed it because, if produced, the alteration would have been readily apparent.

Estate Law § 4:47 (1995). Delivery occurs where the grantor intends the deed to effect a present transfer of the property conveyed, and the grantee assents to the conveyance. *Frankowich* v. *Szczuka*, 321 Mass. 75, 77 (1947). In most instances, but not all, the date of the deed's execution and the date of its delivery are one and the same. The date shown on the deed, therefore, is prima facie evidence of the date of delivery. *Ashkenazy* v. *R.M. Bradley & Co.*, 328 Mass. 242, 247 (1952). However, that presumption may be overcome, as it was here, by evidence of extrinsic facts or circumstances. *Ibid.* Eno & Hovey, *supra* § 4:49 & n.1. Finally, an inconsistency in, or even a complete absence of, a date of execution does not necessarily render the deed ineffective. *Ashkenazy* v. *R.M. Bradley & Co.*, *supra* at 247-248. In fact, "[a] date is not essential to the instrument of conveyance. It takes effect from delivery." *Id.* at 248, quoting from *Dresel* v. *Jordan*, 104 Mass. 407, 417 (1870). It follows from this, that the defendant's alteration of the date of the deed — however fraudulently motivated that action may have been — did not alter its legal effect. Stated another way, the defendant's action in back-dating the deed was aimed, not toward fraudulently effecting a conveyance of property to himself, but toward misleading or deceiving the taxing authorities. Any fraudulent purpose on his part was unrelated to the deed's underlying legal purpose of transferring an interest in specifically described property from the grantor to the grantee.

Nor was there error in the judge's finding that an effective delivery took place. Hazel retained physical possession of the deed for a substantial period of time after she signed it — ostensibly to assure herself (among other things) that the defendant would continue to maintain his sobriety. Moreover, as found by the judge, she was painfully aware that the defendant lacked the means to support himself and his family. She wanted to look after him after her death, by knowing that he would then have full title to the property and could either alienate all or a part of it, or simply use its rents and profits to support himself. There was also testimony from numerous witnesses, found credible by the trial judge, that

Hazel had told them that she had deeded the Nantucket property to the defendant.

The plaintiffs are quick to point out that there was no evidence to support the judge's finding that the deed was delivered in early May, 1984, just before its recording. In a narrow sense, the plaintiffs are correct. The only direct evidence concerning actual delivery was the defendant's testimony that delivery had occurred in 1982, testimony the judge specifically discredited. However, the judge considered other evidence (i.e., that the defendant was a conveyancing attorney and had never held on to a deed for such a long period of time before recording it) and from that, reasonably inferred that the defendant would naturally have protected his personal interests by recording the deed promptly after delivery.

2. *Fiduciary duties surrounding preparation and delivery of the deed.* The plaintiffs contend that, because the defendant acted as Hazel's attorney in drawing up the deed, the relationship between the two was fiduciary in nature. Because he stood to profit from the transaction, the defendant should, therefore, have acted with "active diligence" by advising Hazel of the possible tax and estate planning consequences, by advising her of alternate means of effectuating her supposed desire that the defendant hold title to the property upon her death, and by recommending that she seek the advice of disinterested counsel. At trial, the defendant conceded that he did none of these things.

In his amended findings of fact, the trial judge concluded that an attorney-client relationship existed between the defendant and Hazel, but that the defendant's sole duty within the context of that relationship was simply to draft a deed that would serve as an effective instrument of conveyance. Accordingly, the trial judge declined to amend his ultimate conclusion that the defendant had breached no fiduciary duty owed to Hazel and that, therefore, the plaintiffs were not entitled to a constructive trust in their favor over the Nantucket property.

It has long been the established rule that "the attorney who bargains with his client in a matter of advantage to him-

self must show, if the transaction afterwards is called in question, that it was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger." *Israel* v. *Sommer*, 292 Mass. 113, 122 (1935), quoting from *Hill* v. *Hall*, 191 Mass. 253, 262 (1906).

This rule applies within strict fiduciary relationships such as that between an attorney and his client, or a trustee and the beneficiary of a trust, where the relationship is purely a professional one not complicated by ties of blood, marriage, or close friendship. *Markell* v. *Sidney B. Pfeifer Found., Inc.*, 9 Mass. App. Ct. 412, 442-443 (1980), and cases cited. A presumption of impropriety arises in such situations, where the fiduciary has personally profited from the transaction. *Id.* at 442, citing *Hill* v. *Hall*, *supra*, and *Israel* v. *Sommer*, *supra*. But where the relationship is one between close family members, as was the case here, the presumption of impropriety recedes. Within such relationships, "gifts or other acts of generosity are natural and to be expected." *Id.* at 443. See *Frawley* v. *Snell*, 299 Mass. 398, 403 (1938) (will drafted by testator's son-in-law that named his wife as principal beneficiary was "a natural disposition of the decedent's property" and, therefore, no finding of undue influence on part of son-in-law). See also *Spilios* v. *Bouras*, 337 Mass. 176, 180 (1958), and *Wood* v. *McDonald*, 332 Mass. 220, 222 (1955), both of which arrived at similar results in situations involving family members.

The attorney-client relationship existing between the defendant and Hazel was limited in its scope and was largely overshadowed by extremely close familial ties between the

two. See *Markell* v. *Sidney B. Pfeifer Found., Inc., supra* at 443. Under those circumstances, we conclude that there was no impropriety on the defendant's part serious enough to warrant setting aside the conveyance. The defendant's role as attorney was narrow and circumscribed: he was called on simply to draw up a deed which, upon delivery, would convey the described property to him subject to a life estate. He was not asked to come up with a comprehensive estate plan; nor was he asked to examine the conveyance for possible tax consequences.

On the personal side of the relationship, the defendant was Hazel's only surviving child whom she had supported during her later years. She wished to look after him after her death. The conveyance, therefore, was both a natural reflection of this situation and a natural expression of Hazel's wishes. Any omissions by the defendant in failing to advise her of estate or gift tax consequences or to recommend that she seek disinterested legal advice were largely vitiated by the deed's long delayed delivery. A gap of over three years occurred between the deed's execution and its delivery. The judge found that, up to her death, Hazel was an intelligent and sophisticated woman of undiminished mental faculties who had a good layperson's sense about real estate. She regularly sought out legal advice whenever she felt that was needed. It was not unreasonable to assume, as the judge did, that, during that three-year period before the deed became effective and irrevocable, she would have obtained advice concerning its legal meaning and effect, including possible tax consequences, had she wanted to.

Finally, we conclude that there also was no abuse by the defendant of the sort of close relationship of trust and confidence as was found, for example, in *Markell* v. *Sidney B. Pfeifer Found., Inc., supra* at 443-445. In that case, the settlor of a trust, who was an elderly woman, placed utmost trust and confidence in her nephew and relied totally on his judgment and integrity when she committed the management of all of her assets to him. *Id.* at 444-445. Taking unfair advantage of that relationship, the nephew presented his aunt

with an irrevocable trust instrument, "conceived and carried to execution in considerable haste," *id.* at 434, which had the far-reaching legal effect of immediately divesting the settlor irrevocably of control over the trust principal.[4] Under the trust instrument, the trust income went to the settlor for life, then to the nephew if he survived her, and, upon the death of the survivor, the assets went free of the trust to a foundation which the nephew had established in his own name. The aunt never read the document she had signed, and the nephew never explained its adverse legal effects to her. *Id.* at 445. Contrast *Gagnon* v. *Coombs*, 39 Mass. App. Ct. 144, 154-157 (1995).

The relationship between Hazel and the defendant shared few similarities to the one we have just described. For one thing, there is little to indicate that Hazel placed the sort of pervasive and near total trust and reliance on the defendant's honesty and judgment in matters legal or financial. Primarily, he managed the Nantucket properties. But that was a task with which Hazel herself was quite familiar, as she had successfully done it for nearly twenty years before him. In fact, the defendant was more dependent upon Hazel than she upon him. He relied almost totally upon her for financial support from 1976 until her death in 1988. For her part, Hazel was well aware of the defendant's shortcomings stemming mainly from the period of his active alcoholism.

The transaction itself also shares few similarities to the one in the *Markell* case which, once signed by the settlor, became immediately irrevocable. Hazel retained the deed for over three years. During that time, she exhibited a basic understanding of the nature and legal effect of the transaction,

---

[4]The circumstances surrounding execution of the trust document further supported the finding that the nephew had abused the trust and confidence which the aunt had reposed in him. The instrument was presented to the aunt while she was on vacation in California recuperating from serious physical injuries at a time when her "injuries and her distance from familiar surroundings may have tended to make her dependent on [her nephew] and when those upon whom she had relied in the past for advice . . . were relatively inaccessible to her." *Markell* v. *Sidney B. Pfeifer Found., Inc.*, *supra* at 434.

as evidenced by remarks she made to several persons close to her that she was deeding the Nantucket property to the defendant. That she retained possession of the deed further suggests that she understood that the conveyance would not be effective and irrevocable until such time as she decided to actually deliver the deed. Contrast with *Markell* v. *Sidney B. Pfeifer Found., Inc., supra* at 434-436, where the settlor's understanding, based on what her nephew had told her, of the legal effect of what she had signed was seriously at odds with its true legal effect.

In sum, we think correct the judge's over-all finding that the defendant's duty to Hazel in the circumstances presented was simply to draft an effective deed of conveyance. There was no breach committed of other broader fiduciary duties claimed by the plaintiffs that would warrant setting the conveyance aside.

3. *The defendant's counterclaim for attorney's fees and costs.* In his memorandum of decision, the judge concluded that the plaintiffs' claims were not "wholly insubstantial, frivolous and not advanced in good faith," a finding required by G. L. c. 231, § 6F, for an award of fees and costs, particularly where the defendant "fraudulently altered the deed, gave false testimony before the court concerning that matter, and destroyed his mother's will at the time of her death."[5] The defendant has appealed from the ensuing judgment dismissing his G. L. c. 231, § 6F, claim. The defendant failed to perfect his appeal by first filing an appeal to the single justice of this court as required by G. L. c. 231, § 6G. See *Bailey* v. *Shriberg*, 31 Mass. App. Ct. 277, 282-285 (1991). The appeal is not properly before us and must be dismissed.

The judgment on the plaintiffs' claims is affirmed. The defendant's cross appeal from the dismissal of his counterclaim is dismissed.

*So ordered.*

---

[5]This court in no way condones the defendant's reprehensible conduct in this matter.