MICHAEL J. DUGGAN *vs.* JOSEPH C. GONSALVES & another.[1]

No. 04-P-1340.

Bristol. May 9, 2005. - December 7, 2005.

Present: GREENBERG, BROWN, & BERRY, JJ.

*Attorney at Law,* Attorney-client relationship, Conflict of interest, Fiduciary duty. *Trust,* Constructive trust.

A Housing Court judge hearing a counterclaim in a summary process action erred in declining to impose a constructive trust in favor of the defendants on their home, which the plaintiff attorney had purchased at a foreclosure sale notwithstanding that he had been engaged to represent the defendants in connection with protecting their home from foreclosure and restructuring their debt, including outstanding tax liens, where the attorney acted wrongfully, with clear and deep conflicts of interest, and in breach of his fiduciary obligations to his clients. [255-258]

SUMMARY PROCESS. Complaint filed in the Attleboro Division of the District Court Department on April 1, 2002.

After transfer to the Southeastern Division of the Housing Court Department, the case was heard by *Anne Kenney Chaplin, J.*

*Michael W. Zinni* for the defendants.

*George P. Lordan, Jr.,* for the plaintiff.

BERRY, J. This case involves an attorney who purchased his clients' home at a foreclosure sale, notwithstanding that the attorney had been engaged to represent the clients in connection with protecting their house from foreclosure and restructuring their debt, including outstanding tax liens. The attorney also drafted a purchase and sale agreement to buy the clients' house,

[1] Dorothy M. Gonsalves.

canceled the closing under that agreement, and then proceeded to the foreclosure auction. The attorney was the clients' legal counsel throughout all of the transactions at issue in the case.[2]

After the foreclosure purchase of his clients' house, the attorney entered into a financial arrangement with the clients in which the clients would be allowed to live in the house for one year by making rental payments equal to the attorney's monthly mortgage expenses. When the clients fell behind in these payments, the attorney filed a summary process action in the Housing Court to evict them. A judge of that court declined to impose a constructive trust as prayed for in the clients' counterclaims. We conclude that the attorney acted wrongfully, with clear and deep conflicts of interest, and in breach of his fiduciary obligations to his clients. For these wrongdoings, a constructive trust should have been imposed. We reverse.

*Factual background.* The judge's decision, undisputed trial evidence, and the case record disclose the following facts. Joseph Gonsalves and his wife, Dorothy, resided in a house in North Attleborough, which they had purchased in 1991. Joseph also owned a business, Jade Machine & Engineering; Dorothy worked as a bookkeeper and office manager there. In or about 2000, the business suffered financial reversals. Federal and State tax liens, which totaled more than $100,000, were filed against the Gonsalveses' home. Michael J. Duggan was engaged by the Gonsalveses to negotiate with the government to resolve those liens.

Given their financial straits, the Gonsalveses also fell behind in mortgage payments to Plymouth Savings Bank. Duggan's engagement encompassed representing the Gonsalveses to attempt to avoid foreclosure by the bank. At one point, Duggan advised the Gonsalveses not to make any further mortgage payments "because it would be throwing money away when we refinanced."

The strategy that Duggan devised to avert foreclosure involved negotiations with the bank, and the filing of bankruptcy petitions to forestall foreclosure by virtue of the automatic stay

---

[2]The trial court judge found that the attorney "began to represent the [clients] in or about October 2000" and that the representation "continued until at least February 2002."

of the bankruptcy laws.[3] Ultimately, however, the bank sought and obtained a release of the stay from the Bankruptcy Court.

In addition to the strategy of blocking foreclosure through bankruptcy filings, Duggan also gave legal advice to his clients vis-à-vis a potential sale of the house versus refinancing. Duggan advised the Gonsalveses that they could not sell the house because of the outstanding tax liens. However, Duggan stated that he would pursue refinancing through an individual he then knew in the mortgage industry. A potential sale or refinancing, it appears, would, theoretically at least, have drawn on any equity realizable on account of an increase in the house's valuation.

In summary, the Gonsalveses assumed that Duggan's legal representation of them was proceeding on a range of fronts: to refinance their home; to settle their tax liabilities; and to stop a foreclosure. Duggan, however, did not keep his clients informed concerning what was transpiring, or the prospects, or lack of prospects, of success from whatever workout efforts in which he was engaged. Seeking such information, a tax specialist working for the Gonsalveses tried to contact Duggan. Duggan did not return his calls. The Gonsalveses, accordingly, were not fully apprised by their lawyer that their financial solution was bleak, that whatever efforts Duggan had undertaken had been unavailing, and that their home was at great risk.

The bleakness of the financial picture became fully apparent in the fall of 2001. The Federal and State tax liens remained outstanding; settlement negotiations of whatever measure undertaken by Duggan were not availing; the refinancing Duggan suggested had not materialized; and the foreclosure was looming on the horizon, the bankruptcy stay having been lifted and whatever proposals that had been presented to the bank having failed.

Duggan, however, had a new "strategy." He proposed to buy the Gonsalveses' house himself, and presented to his clients a

---

[3]On February 12, 2001, Duggan filed a petition in Joseph's name under Chapter 13 of the United States Bankruptcy Code; in May, 2001, this petition was converted to a Chapter 7 liquidation proceeding. See 11 U.S.C. §§ 701 et seq., 1301 et seq. In June, 2001, Duggan also filed a Chapter 7 petition on behalf of Dorothy.

purchase and sale agreement that he had drafted. Duggan's purchase price was $145,000, notwithstanding the house had been previously appraised at $239,000. Duggan told the Gonsalveses that he would negotiate and "take care of the taxes" from the proceeds of his purchase, and would also return $25,000 to them. The Gonsalveses signed the purchase and sale agreement — without any review by independent counsel.

As the foreclosure date became imminent, Duggan withdrew from the agreement to buy the house. About a week or two prior to the scheduled foreclosure sale, Duggan canceled the deal, citing as the reason therefor that he could not achieve a desirable result with the taxing authorities.

It was also just before the foreclosure auction scheduled for November 7, 2001, that Duggan informed the Gonsalveses that he intended to bid on their house. Duggan told his clients that if he were the successful foreclosure bidder, he would enter into a financial arrangement with his clients, whereby the Gonsalveses would be allowed to stay in their home for a year. The terms of this attorney-client financial transaction were that the Gonsalveses were to pay rent sufficient to cover Duggan's monthly mortgage expenses.

To continue the saga: Duggan was, in fact, the successful bidder at the November 7, 2001, foreclosure sale. Duggan's bid was $210,000. (Approximately four months later, Duggan advertised the house for sale at $345,000.)

The day following the foreclosure sale, Duggan told the Gonsalveses that "it was all set." The Gonsalveses understood that, following Duggan's purchase, they would receive any "left-over" monies from the foreclosure sale in about a month or two.[4] For a time after the foreclosure, no money was forth-

---

[4]The Gonsalveses believed — and, it appears, Duggan did not advise them otherwise — that after the foreclosure sale, the liability for the tax liens would be satisfied. This may account for the Gonsalveses' calculation that approximately $100,000 to $132,000 would revert to them following the foreclosure auction. We need not address the accuracy of these numbers and calculation. The significant point is that Duggan, their attorney, did not fully advise his clients as to the effects of his self-interested purchase at the foreclosure sale.

coming.[5] That being so, the Gonsalveses began to question whether Duggan had properly represented them. A dispute broke out concerning the rent that the Gonsalveses were supposed to pay. The Gonsalveses fell in arrears.

Ultimately, Duggan commenced a summary process action in the Housing Court against the Gonsalveses for possession and rental arrearages. The Gonsalveses filed a counterclaim, alleging breaches of fiduciary duty by Duggan arising out of conflicts in Duggan's representation and ethical violations; breaches of the implied duties of good faith and fair dealing; misrepresentation; and a violation of G. L. c. 93A. The counterclaim sought equitable relief, including imposition of a constructive trust covering the house or any profits realized by Duggan on account of his transactions relative to the property.[6]

The Housing Court judge bifurcated the case and limited the initial issue to be tried — the principal issue presented in this appeal — solely to whether a constructive trust should be imposed. The judge concluded there was no fraud or undue influence by Duggan, nor any mistake, and that a transferor-transferee relationship did not exist between the Gonsalveses and Duggan. On these bases, the judge concluded that a constructive trust was not legally warranted.[7] In our opinion,

---

[5]There was evidence that Duggan had prepared an affidavit for Dorothy to sign, requesting that the Wareham District Court release monies from the foreclosure sale, and that the affidavit falsely recited that Dorothy had never worked for Jade Machine & Engineering. Joseph told Duggan his wife would not sign the affidavit. According to the Gonsalveses, Duggan replied that in that case, the Gonsalveses would not get the funds. Eventually, however, Dorothy did receive funds.

[6]The jurisdiction of the Housing Court extends over "civil actions arising . . . under the provisions of common law and of equity . . . concerned directly or indirectly with . . . the possession, condition, or use of any particular housing accommodations." G. L. c. 185C, § 3, as appearing in St. 1987, c. 755, § 3. See Worcester Heritage Soc., Inc. v. Trussell, 31 Mass. App. Ct. 343, 347 n.3 (1991). That jurisdiction encompassed the original summary process action, as well as the counterclaims, including the request for imposition of an equitable constructive trust.

[7]Subsequently, the same judge, acting on Duggan's summary process complaint, ordered the same dismissed for his failure to bring before the court a notice to quit. At a later proceeding, the judge ruled that Duggan had satisfied his burden to prove a right of possession of the property; Duggan was also awarded damages of $6,400 for the arrearage in rent.

this analysis is error of law.[8]

*Analysis.* An attorney is held to a high standard of fair dealing when he or she engages in a commercial transaction with a client. *Pollock* v. *Marshall*, 391 Mass. 543, 555 (1984). "That '[u]nflinching fidelity to their genuine interests is the duty of every attorney to his clients' is beyond question." *Ibid.*, quoting from *Berman* v. *Coakley*, 243 Mass. 348, 354 (1923). The conflicts of interest presented in this case and the ethical issues surrounding Duggan's entering into the aforesaid transactions with his clients are patent.[9,10] Duggan's oxymoronic plan to purchase at foreclosure for himself the house that he had

---

[8]On appeal, the Gonsalveses do not contest the denial of their G. L. c. 93A claim. Accordingly, that claim is deemed waived.

[9]The ethical rule governing attorney conflicts in respect to business transactions with a client, Mass.R.Prof.C. 1.8, 426 Mass. 1338 (1998), provides in pertinent part:

> "RULE 1.8 CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS
>
> "(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:
>
> "(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> "(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> "(3) the client consents in writing thereto."

The rule of professional conduct quoted above is consistent with the "old" disciplinary rule. See S.J.C. Rule 3:07, Canon 5, DR 5-104(A), as appearing in 382 Mass. 781 (1981), which stated, "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment for the protection of the client, unless the client has consented after full disclosure."

[10]The ethical rule governing attorney conflicts vis-à-vis a client's interests, Mass.R.Prof.C. 1.7, 426 Mass. 1330 (1998), provides in pertinent part:

> "RULE 1.7 CONFLICT OF INTEREST: GENERAL RULE
>
> ". . .
>
> "(b) *A lawyer shall not represent a client if the representation of that client may be materially limited by* the lawyer's responsibilities to

been engaged as legal counsel by the Gonsalveses to protect from foreclosure, as well as Duggan's financial dealings with his clients — e.g., the prior proposed purchase and sale agreement and the subsequent rental deal — were rife with conflicts of interest and self-dealing. See Mass.R.Prof.C. 1.7, 426 Mass. 1330 (1998); Mass.R.Prof.C. 1.8, 426 Mass. 1338 (1998), as set forth in notes 9 and 10, *supra.* There was, moreover, no review by independent counsel to protect the interests of the clients. See Mass.R.Prof.C. 1.8, *supra.*

The Supreme Judicial Court has "set aside transactions between attorneys and clients where that loyalty [of attorney to client] has been violated." *Pollock* v. *Marshall*, 391 Mass. at 555. See *Webster* v. *Kelly*, 274 Mass. 564 (1931); *Israel* v. *Sommer*, 292 Mass. 113, 124 (1935). The governing ethical and equitable principles are well capsulized in *Hill* v. *Hall*, 191 Mass. 253, 262 (1906):

> "It is a well settled rule in equity, applicable to all transactions between attorney and client by way of purchases, sales or gifts, that the attorney who bargains with his client in a matter of advantage to himself must show, if the transaction afterwards is called in question, that it was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger."

Accord *Graves* v. *Hutchinson*, 39 Mass. App. Ct. 634, 641-642 (1996).

another client or to a third person, or by *the lawyer's own interests*, unless:

"(1) the lawyer reasonably believes the representation will not be adversely affected; and

"(2) the client consents after consultation. . . ." (Emphasis supplied.)

The record in this case demonstrates that Duggan's transactions with his clients did not fall within the heartland of the fairness and equitable standard, and that he breached the fiduciary duties and obligations of legal counsel to client. Duggan's acquisition of his clients' home, as originally envisioned in the purchase and sale agreement and then as accomplished in the foreclosure sale; Duggan's post-purchase rental deal with his clients; and Duggan's conflicted legal representation, which was supposed to protect his clients' right, title, and interest in their house, but which ultimately and contradictorily served to vest that right, title, and interest in Duggan, not only had the undeniable markings of fundamentally unsound legal representation tainted by the attorney's self-interest, but also smacks of overreaching. It cannot be gainsaid that the Gonsalveses did not comprehend the full array of legal options available to them, or the legal ramifications of Duggan's self-interested dealings.

Furthermore, contrary to the ethical rules that codify a lawyer's fiduciary obligation and duty of fidelity throughout his financial transactions with his clients, Duggan did not disclose to the clients the rampant conflicts of interest surrounding his actions and did nothing to suggest that the Gonsalveses ought to consult with an independent lawyer. Thus, Duggan's transactions with his clients were not probed by the neutral and detached eyes of independent counsel. See *Israel* v. *Summer*, 292 Mass. at 122-124.

In declining to impose a constructive trust, the Housing Court judge's legal analysis was too restrictive and was legally erroneous. "Under Massachusetts law, a court will declare a party a constructive trustee of property for the benefit of another if he acquired the property through fraud, mistake, breach of duty, or in other circumstances indicating that he would be unjustly enriched." *Foster* v. *Hurley*, 444 Mass. 157, 167 (2005), quoting from *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 789, cert. denied, 511 U.S. 1142 (1994). A transaction may be set aside, or a constructive trust imposed, where a lawyer has acted in violation of fiduciary obligations owed to a client, or in such other circumstances as to prevent a lawyer from being unjustly enriched as a result of a transaction with a client. See *Rolikatis* v. *Lovett*, 213 Mass. 545, 548 (1913).

Indeed, it is well settled in Massachusetts that a constructive trust may be imposed when an attorney engages in self-dealing in a real estate transaction with his clients. *Ibid.* (constructive trust imposed where an attorney, engaged to buy property for his client, bid on it for himself and refused to recognize his client's interest in the property). Taken to the core, "[t]he law looks with great disfavor upon an attorney who has business dealings with his client which result in gains to the attorney at the expense of the client." *Goldman* v. *Kane*, 3 Mass. App. Ct. 336, 341 (1975).

Duggan acted in conflict with his clients' interests and his wrongful conduct played a major role in his acquisition of the property. "Where a fiduciary, in violation of his duty to the beneficiary, causes property to be transferred to a third person, the third person, if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary." *Demoulas* v. *Demoulas*, 428 Mass. 555, 581 (1998). See *Barry* v. *Covich*, 332 Mass. 338, 342 (1955); *Sullivan* v. *Rooney*, 404 Mass. 160, 163 (1989); *Hatton* v. *Meade*, 23 Mass. App. Ct. 356, 365 (1987). "[T]he rules imposing a constructive trust rest not upon damage but 'upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.' " *Judge* v. *Gallagher*, 17 Mass. App. Ct. 636, 643 (1984), quoting from *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198-199 (1948).

The judgments are vacated. Further proceedings are necessary to formulate a constructive trust to be imposed in favor of the Gonsalveses. To unwind the financial morass that attorney Duggan made infinitely more murky, to determine the respective amounts to which the Gonsalveses are entitled, and to order whatever actions are best undertaken to secure the constructive trust, the case is remanded for an accounting in conformity with this opinion. The court on remand, in its discretion, may appoint a master to conduct this accounting.

*So ordered.*